UNITED STATES of America, Plaintiff,

v.

SEYMOUR RECYCLING CORP., et al., Defendants.

Civ. A. No. IP 80–457–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 15, 1982.

## MEMORANDUM

STECKLER, District Judge.

This matter comes before the Court for consideration of a proposed Consent Decree which the United States has lodged with the Court. The proposed Consent Decree provides for a surface cleanup of the approximately 60,000 barrels of toxic chemicals, bulk storage, and contaminated soil at the Seymour Recycling Site in Seymour, Indiana.

The United States filed the original complaint in this action on May 19, 1980, alleging violations of Section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973 and Section 311 of the Clean Water Act (CWA), 33 U.S.C. § 1321 against various parties including those who owned and operated the Seymour Recycling Site. Named defendants answered the complaint, and discovery proceeded.

On October 26, 1982, the United States filed with this Court an amended complaint adding additional allegations as to the original defendants under the Comprehensive Environmental Response, Compensation, and Liability Act (known as "CERCLA" or "Superfund"), 42 U.S.C. § 9606 and § 9607, enacted after the filing of the original complaint. In addition, the United States named in the amended complaint 24 new defendants, who are alleged to have "generated and caused to be transported solid and hazardous wastes and hazardous substances to the Seymour Site for handling, storage, treatment, or disposal." Motions to intervene were filed by the State of Indiana and the County of Jackson on October 26, 1982. On the same day the United States, the

State of Indiana, the County of Jackson, Indiana, the City of Seymour, Indiana, the Board of Aviation Commissioners of Seymour, Indiana, and the 24 companies who were the new defendants added by the amended complaint filed a proposed Consent Decree with the Court.

This Consent Decree provides a mechanism by which the surface cleanup of the Seymour Recycling Site may promptly occur. The Decree provides that each of the 24 companies shall, within 15 days after the entry of the Decree, pay to the Seymour Site Trust Fund, established at a bank in Indianapolis, the sum for that company which is shown in Exhibit A to the Decree.[1] The Trustees of the Fund shall use the money in the Trust Fund to pay Chemical Waste Management, a firm specializing in hazardous waste removal, to perform the surface cleanup at the Seymour Site. The precise scope of work to be done by Chemical Waste Management is set forth in detail in Exhibit B to the Consent Decree.[*] The Decree also provides that Chemical Waste Management shall be responsible for the completion of the work regardless of its ultimate actual cost and that Chemical Waste Management shall purchase a performance bond in the amount of $15,000,000, which bond shall further assure completion of the work. The Decree specifies the obligations of Chemical Waste Management to purchase and to maintain in force insurance policies to protect the United States, the State and the public. It is contemplated that this project shall take approximately one year to complete. The Decree provides for continuing observation and monitoring of the progress of the work by the United States and the State as well as their approval of the satisfactory completion of the work.

The Decree contains a provision requiring the preservation of documents relating to their business transactions with Seymour Recycling Inc. by the 24 companies. It contains a provision by which the United States, the State and the local governments covenant not to sue, execute judgment or take any civil, judicial or administrative action against the 24 companies.

At the time of lodging, the Court set a hearing on the Consent Decree for November 10, 1982. On October 29, 1982, pursuant to its regulations published in 28 C.F.R. 50.7, the United States Department of Justice published notice in the Federal Register, 47 *Fed.Reg.* 49107, of the lodging of the Consent Decree and invited public comment on it. The public comment period which is normally thirty (30) days was shortened to ten (10) days, pursuant to these regulations, because in the judgment of the Department of Justice there was a need to begin the surface cleanup expeditiously to abate a serious public health hazard because the advent of winter in the Seymour area could adversely affect the ability of the contractor to begin work at the Site.

In response to the Federal Register notice, comments were received from sixteen corporations. No comments were received from any individual citizens. On November

---

1. The 24 companies and the amount which each shall pay is as follows: International Business Machines Corporation—$2,241,001; General Motors Corporation—$1,032,961; E.I. du Pont de Nemours & Company, Inc.—$682,805; General Electric Company—$665,297; Western Electric Company, Inc.—$385,172; United Technologies Corporation—$350,156; Atlantic Richfield Company on behalf of The Anaconda Company, Anaconda Wire & Cable Company, Anaconda Aluminum Company, Anaconda Industries, and Anaconda Magnet Wire—$245,109; Borg-Warner Chemicals, Inc.—$245,109; RCA Corporation—$175,078; Bemis Company Inc.—$175,078; Ford Motor Company—$175,078; Whirlpool Corporation—$140,062; McDonnell Douglas Corporation—$105,047; Dow Corning Corporation—$105,047; Penn-

walt Corporation—$100,000; Owens-Illinois, Inc.—$100,000; The Procter & Gamble Company—$100,000; General American Transportation Corporation—$100,000; American Can Company—$100,000; Olin Corporation—$100,000; AM General Corporation—$100,000; Cummins Engine Company Inc.—$100,000; NCR, Corp.—$100,000; Waste Resources of Tennessee, Inc. (an affiliate of Chemical Waste Management, Inc.)—$100,000.

* Exhibit B, entitled "Technical Proposal For The Removal and Disposal of Drummed Hazardous Chemicals and Waste Materials Located at Seymour Recycling Center, Seymour, Indiana" has been omitted from publication by consent of the Court.

10, the United States filed with the Court copies of comments which it had received as well as its Response to those comments.

At the November 10 hearing, the United States explained the background to the Decree, and all interested persons, including those who were objecting to the entry of the Decree and were not a party in the action, were provided with an opportunity to participate in the hearing and to present their various positions to the Court. At this hearing, representatives of several objecting companies made statements to the Court. At the conclusion of the hearing the Court indicated, in response to objections that the comment period was too short, that the period for public comment would be extended to November 26, 1982, and that a further hearing would be scheduled by the Court for November 30. Several additional comments were received during this period. These were filed with the Court along with the Response of the United States to the Comments.

At the hearing on November 30, the Court once again permitted all interested persons, including those who were not parties in the action, to participate and to present any objections which they might have to the Decree. Again, several objectors made statements to the Court. There were no requests made for formal intervention, notwithstanding the government's statement that it would not oppose such intervention. Those participating in the hearing on November 30 included, in addition to the United States, representatives of the City of Seymour and the Seymour Aviation Board, the State of Indiana, the Seymour Chamber of Commerce, the League of Women Voters of Seymour, representatives from companies within the group of 24, and representatives of companies opposing the decree. The United States presented sworn testimony from an official of Chemical Waste Management, from an official of the Environmental Protection Agency of the United States Government, and from two officials from the State of Indiana. An opportunity was provided for cross-examination of these witnesses. Finally, in addition to the materials submitted by the Department of Justice and the information presented at the hearings on November 10 and November 30, a number of comments about the Consent Decree were submitted directly to the Court. The United States filed its Supplemental Response to Comments as it is required to do so by its regulations. See 28 C.F.R. 50.7. After consideration of the comments, the United States continues to advocate the entry of the proposed Decree and gives its consent to the entry of the Decree.

The Court has concluded, based upon a careful review and consideration of all the information presented to it, that the Court should approve the Consent Decree. The surface cleanup authorized by this Decree is a very valuable and important part of the overall cleanup of the Seymour Site, which is in the public interest and particularly in the interest of those citizens affected by the Site. The Court is persuaded that time is of the essence in commencing this cleanup before the onset of winter. Accordingly, this cleanup should proceed as promptly as possible without any further delay.

 In deciding whether to approve a proposed decree, a court must inquire whether the decree is consistent both with the Constitution and with the mandate of Congress. See *United States v. Ketchikan Pulp Co.,* 430 F.Supp. 83, 86 (D.Alaska 1977); *United States v. Hooker Chemicals and Plastics Corp.,* 540 F.Supp. 1067, 1072 (W.D.N.Y.1982). Second, the court "must assure itself that the terms of the decree are fair and adequate." See *United States v. Hooker Chemicals and Plastics Corp.,* 540 F.Supp. at 1072. Finally, the court must inquire whether the settlement is a reasonable one. See *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), *cert. denied,* —— U.S. ——, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). The underlying purpose of the court in making these inquiries is to determine whether the decree adequately protects the public interest. *United States v. Ketchikan Pulp Co., supra,* 430 F.Supp. at 86. The court "must eschew any rubber stamp approval in favor of an inde-

pendent evaluation," *United States v. Hooker Chemicals and Plastics Corp., supra,* 540 F.Supp. at 1072, but because of the clear public policy favoring settlements the court must not substitute its judgment for that of the parties. *See Airline Stewards v. American Airlines,* 573 F.2d 960, 963 (7th Cir.1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190.

■ (1) *Legality.* With regard to the factors of legality and constitutionality, no objection has been raised to the entry of the Decree. Those statutes under which the amended complaint has been filed empower the United States to bring enforcement actions. *See* 42 U.S.C. § 9606, 42 U.S.C. § 6928, 42 U.S.C. § 1321(e). Furthermore, the authority of the United States and the Attorney General to compromise during litigation is well established. *See United States v. Hooker Chemicals and Plastics Corp., supra, United States v. Ketchikan Pulp Co., supra.* Here the Consent Decree is not violative of any law; indeed, it furthers compliance with the statutes under which the action was brought, most particularly with Superfund. In addition, all of the parties to the Decree have consented to the jurisdiction of the Court for the purposes of this Decree.

(2) *Fairness.* With respect to the rights and obligations of the parties consenting to the Decree, there is no objection as to fairness. All of these parties have urged its entry. This Court has, however, looked beyond the parties consenting thereto and considered the arguments raised by nonparties, both in comments filed with the Department of Justice and in arguments presented to this Court that the entry of the Decree is unfair to them. However, no objecting party requested an opportunity to intervene in this action to offer any evidence of alleged unfairness nor asked to cross-examine any witness.

No citizen of Seymour has objected to the entry of the Decree. However, the unfairness issue has been raised by companies who also generated and/or caused to be transported hazardous waste to the Seymour Site, but who are not included within the group of 24 companies who are a party to the Consent Decree. These objecting companies argued to this Court that the 24 companies who are parties to the Consent Decree and who shipped approximately 50% of the waste to the Site will be paying $7.7 million for the surface cleanup, while the remaining more than 300 companies who shipped the other 50% of the waste to the Site are being asked to pay in separate settlement negotiations with the United States, which are unrelated to this Consent Decree, the sum of $15 million for groundwater cleanup at the Site. The Court has considered carefully and in detail the arguments being advanced by these objectors. It has decided, however, to reject these arguments on the basis of the evidence presented to the Court and arguments by counsel for the United States and for one of the 24 companies.

These facts show that the United States, mindful of its responsibility to clean up the Seymour Site in an expeditious manner in the public interest, decided to split the task into two separate parts, each of which the United States estimates comprises approximately one-half of the work required to achieve a total cleanup of the Site. The first of these parts is the cleanup of the surface at the Site. The evidence presented demonstrated that this surface cleanup must necessarily proceed before any subsurface or groundwater cleanup because only when the barrels have been removed from the Site will it be possible to clean up the subsurface. Moreover, the evidence showed that the continued presence of leaking barrels of waste on the surface will exacerbate any groundwater contamination.

The group of 24 companies came to the United States with a proposal by which they would arrange with a contractor to perform the surface cleanup in accordance with specifications agreed to by the companies, the United States and the State, regardless of the cost of that work and regardless of cost overruns. Specifically, the Consent Decree provides a $7.7 million cash fund plus a $15 million completion bond for a total cash fund of $22.5 million to pay for completion of the work described in Exhibit B to the Consent Decree. In addition the

United States may look to the contractor's assets to require completion of the work, and the contractor is obligated by the terms of the Decree to complete the surface cleanup set forth in Exhibit B to the Decree regardless of its ultimate cost.

· At the same time, the United States has set in motion, through negotiation, a procedure by which each of those companies who sent waste to the Site, but are not parties to the Consent Decree may pay a fixed sum of money, based upon the volume of material which they sent to the Site, and thereby obtain a covenant not to sue by the United States. This is a "cash out" proposal which does not require these parties to arrange for the performance of any work. While in total the sum being asked from those who are not a party to the Consent Decree is greater than the sum being paid by the 24 who are parties to the Decree, this does not render the government's approach unfair to any parties. Those who are parties to the Consent Decree took upon themselves the obligation to hire the contractor and to develop a work proposal by which the surface cleanup is to be completed without active management (but with monitoring) by the United States and without respect to cost. Those companies who are not parties to the Decree have a number of choices. They may accept the government's offer for a cash settlement in return for a covenant not to sue; they may try to form a group of their own to deal with the groundwater cleanup in a manner comparable to that dealt with by the 24 companies with respect to the surface; or they may choose to litigate with the United States in which case they may end up with a smaller payment on a proportional basis than those who are in the group of 24.

One of the factors that the Court found persuasive on this issue of unfairness is that by the time of the November 30 hearing approximately 140 companies of those not part of the group of 24 decided to accept the government's "cash out" offer. Their total sum of payment will be in excess of $3 million. To the Court, the large number of acceptances of the government's "cash out" offer indicates that this offer was not unfair and that the government was dealing fairly with those who were not parties to the Consent Decree.

There is a public interest in encouraging parties to come forward first in an effort to settle enforcement cases. This is consistent with the general policy favoring the compromise of claims.

Finally, with respect to the fairness issue, no evidence, such as sworn testimony (as opposed to written statements or arguments of counsel) was ever presented to the Court on this issue by the objectors. Based upon the record before the Court as a whole, the Court finds that the United States has not dealt unfairly with those companies who are not parties to the Consent Decree.

(3) *Reasonableness.* In considering the reasonableness of the Consent Decree, the Court has considered five factors: 1) the nature and extent of the potential hazards at the site; 2) the availability and likelihood of alternatives to the Consent Decree which would result in cleanup of the surface of the site; 3) the adequacy of the technical proposal of the work which will be undertaken; 4) the extent to which the Consent Decree furthers the goals of the statutes which form the basis for this litigation; 5) the extent to which the Court's approval of the Consent Decree is in the public interest.

At the hearing on the Consent Decree, the United States presented the testimony of Beverly Kush, employed as on-scene coordinator for the Seymour site by the United States Environmental Protection Agency, James Hunt, Division of Land Pollution Control of the Board of Health of the State of Indiana, David Lamb, Director of the Division of Land Pollution Control of the Board of Health of the State of Indiana and Raymond W. Bock, Director of Sales and project supervisor for Chemical Waste Management, Inc. which will perform the actual cleanup work at the Seymour site. No other evidence was presented by any other party or participant in the hearing. No one chose to cross-examine the government's witnesses.

The unrebutted testimony of Kush, Hunt and Bock established that there are approx-

imately 60,000 barrels of hazardous chemicals, numerous bulk storage tanks and laboratory chemicals present at the Seymour site. Although fenced, the site is relatively unsecure and is susceptible of vandalism or easy entry. The site is located within one-half mile of a residential area which depends on wells for drinking water. The runoff of rainwater from the site flows into a drainage ditch which leads off the site and ultimately connects with the East Fork of the White River. Beverly Kush testified that the flow of underground water in the aquifer beneath the site is away from the site towards the residential drinking water wells and the White River.

Through the testimony of Hunt, Bock and Kush the government established that the drums on the site were in an extremely deteriorated condition. The witnesses estimated that between 35–75% of all drums on site were corroded and rusting and were leaking materials into the ground. Government's exhibits 1–27 (a video-tape and twenty-six slide photographs of the site) graphically depicted the dilapidated condition of the barrels on the site. Through the testimony of Hunt and Bock the government showed that the conditions of the barrels had significantly deteriorated during each of the past two years. Kush and Hunt testified that, in their opinions, the site presented an immediate, substantial endangerment to public health and the environment and that fire, explosion and groundwater contamination were possible hazards which the conditions at the site could cause.

In the opinion of Kush, Hunt and Bock it is essential that the surface cleanup of the site begin as expeditiously as possible. Bock testified that delaying the beginning of the project until the onset of winter would make timely completion substantially more difficult if not impossible. He further testified that if frozen ground conditions occurred before the initial site preparation (such as road grading and construction of barrel crushing facilities) was completed, the cleanup activities would in all likelihood not be able to begin until Spring of 1983. Hunt, Kush and Bock all testified that many of the barrels might not withstand

another winter at the site and that the condition of the barrels was continuing to deteriorate and would do so if allowed to remain on site.

The Court is persuaded that clean-up of the surface of the site must start as soon as possible to protect against the potential hazards testified to by Kush, Hunt and Bock. The court is very concerned that delay in clean-up will exacerbate the potential for groundwater contamination from the leakage and spillage of chemicals and other substances onto the surface of the site. The government's evidence showed that chemicals and substances which are spilled on the ground at the site may and are getting into groundwater under the site. The Court believes that a prompt cleanup of the surface coupled with analysis of the potential groundwater contamination is essential to the protection of public health and the environment. Kush and Hunt testified that both the federal and state governments place high priority on the determination of the existence and scope of groundwater contamination and the undertaking of the appropriate remedy for it. Both testified that completion of groundwater studies and implementation of a groundwater remedy cannot take place until the surface cleanup is completed. Accordingly, the Court finds the hazardous conditions at the site require an expeditious cleanup of the surface of the Seymour site.

Through the testimony of David Lamb from the Board of Health of the State of Indiana the government established that the State of Indiana lacks any fund with which to match federal expenditures at the site which could come from the Hazardous Response Trust Fund (of "Superfund"). Matching funds are required under Section 104(c)(3) of the Statute, 42 U.S.C. § 9604(c)(3). Mr. Lamb testified that the earliest time the State could realistically expect to provide as much as $1 million in matching funds would be the summer or fall of 1983. Matching funds in the amount of $3.5 million would, in Mr. Lamb's opinion, be available no sooner than the summer of 1984. Ms. Kush from EPA testified that no Superfund monies were available to un-

dertake the surface clean-up. Thus, it appears to the Court that the expenditure of funds under authority of Superfund is not a viable alternative to the Consent Decree as a method of insuring expeditious cleanup of the surface of the site.

The Court judicially notices, and it is the unrebutted testimony of Kush and Hunt, that prior to the clean-up plan embodied in the Consent Decree, no plan insuring full cleanup of the surface had been forthcoming from any party to the litigation or any other persons, other than a temporary, emergency action by EPA. No objecting party could assure the Court that the surface cleanup could promptly be accomplished through any other mechanism than the Consent Decree. Government counsel represented to the Court that previous negotiations for cleanup had proved unfruitful. The oral and written representations of counsel for both objecting parties and counsel for one of the defendants which are parties to the decree confirm the past failure of negotiations.

No party disputes the technical adequacy of the plan for surface cleanup. The testimony offered by the government from Kush, Hunt and Bock convinces the Court that the plan submitted to the Court is acceptable to the state and federal agencies charged in the first instance with assuring that the proposal is adequate to protect public health and the environment. The Court has satisfied itself through expert testimony that the plan is adequate to accomplish the surface cleanup of the site consistent with the protection of public health and the environment which are the goals of the Resource Conservation and Recovery Act (RCRA); Comprehensive Environmental Response Compensation Liability Act and the Clean Water Act.

In addition, the Court has determined that the approach taken here by the United States with respect to hazardous waste cases generally is reasonable from the standpoint of the long-range public interest. It is desirable to settle such cases, without the necessity for litigation.

In considering the reasonableness of the approach taken by the government, the Court has inquired of counsel as to how the group of 24 was developed. The Court is satisfied that the approach taken by the government in negotiating with this group was a reasonable one, having in mind the statutory goals of Superfund. Counsel has represented to the Court the following: As a part of the surface cleanup the 24 companies have created a Trust Fund utilizing a Trust Agreement as their legal mechanism and that IBM, General Motors, Cummins Engine and Merchants National Bank & Trust Company of Indianapolis will be the Trustees. The purpose of this Trust Agreement is to provide for the creation of the Fund which will make payments to Chemical Waste Management to perform the work described in Exhibit B to the Consent Decree. In this regard, the Trust Fund has an agreement with Chemical Waste Management to perform the work described in Exhibit B. This agreement contains a schedule for payments to Chemical Waste Management, and it establishes rights and responsibilities as between Chemical Waste Management and the Trust Fund. The purpose of both of these agreements is to create a funding mechanism to insure prompt completion of the work. Neither the United States nor the State is a party to either of these two agreements. There is a further agreement being negotiated between the United States and the City of Seymour and the Seymour Aviation Board pertaining to the covenant not to sue being given to those companies who are not a party to this group of 24. Counsel has represented to the Court that the United States has no other agreements with the 24 consenting companies listed in Exhibit A to the Consent Decree concerning the cleanup of the Seymour Site.

■ Under the standards enunciated above, the Court finds that the government's action in entering into this decree is reasonable and is in the public interest. In reaching this determination, the Court has particularly considered the need to abate the hazardous conditions at the site as expeditiously as possible and the unavailability of any other prompt plan to undertake the cleanup.

In its review of the Consent Decree, as originally filed with the Court, the Court observed that the Decree provided that the 24 companies were required to preserve records and documents relating to Seymour Recycling Corporation only for a six month period after the effective date of the Decree. In response to a proposal by the Court, the companies agreed to modify that provision (which is in Paragraph XI of the Decree) to require that the companies will each preserve "pending further Court order" records and documents relating to Seymour Recycling Corporation. By this modification of the Decree, the Court has insured the availability of documents and records should a discovery request be made for them in the ongoing litigation with those who are not a party to the Consent Decree. Of course any party to whom a request for the production of documents is made may assert any claims which he has under the Federal Rules of Civil Procedure.

In summary, for the foregoing reasons, the Court believes that the Consent Decree (as modified in Paragraph XI), is in accordance with the public interest. It satisfies the requirements of legality, fairness and reasonableness. Accordingly, the Court has this date signed and entered the Consent Decree.

## CONSENT DECREE

WHEREAS, the United States of America ("United States") filed a complaint in this case on May 9, 1980, under Section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321, alleging, inter alia, the existence of an imminent and substantial endangerment to human health, welfare and the environment due to the handling, treatment, storage, transportation, disposal and presence of solid and hazardous wastes and other pollutants and contaminants ("Materials") at Freeman Field Industrial Park near Seymour, Indiana ("Seymour site"); and

WHEREAS, the United States filed an amended complaint on the 26th day of October, 1982, under Sections 106 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9606, 9607, alleging, inter alia, that as responsible parties under CERCLA, those companies listed in Exhibit A hereto (hereinafter the "Companies") have created or contributed to the existence of an imminent and substantial endangerment to public health, welfare or the environment at the Seymour site and are thus liable for abatement of the endangerment and for costs expended by the United States to abate the endangerment at the Seymour site; and

WHEREAS, the Companies deny responsibility for the disposal of materials at the Seymour site and deny any legal or equitable liability under any statute, regulation, ordinance or common law for any response costs or damages caused by storage, treatment, handling or disposal activities or actual or threatened release of materials at the Seymour site or by materials, if any, disposed of by the Companies to, through or at the direction of Seymour Recycling Corporation or any of the defendants in Civil Action No. IP–80–457–C; and

WHEREAS, (1) the United States, (2) the State of Indiana ("State"), and (3) the County of Jackson, Indiana, the City of Seymour, Indiana and the Board of Aviation Commissioners of the City of Seymour, Indiana (the latter three entities hereinafter the "local governments") desire to covenant not to sue, not to issue administrative orders or to execute judgment against the Companies for civil matters arising out of the transportation, storage, treatment, handling, disposal or presence of materials by the Companies at the Seymour site but not in such a way as to impair any claim which the United States or State may have against any other person or entity than the Companies; and

WHEREAS, it is not the intention of the United States or the State by entering into this Consent Decree to settle any claim, or to covenant not to sue or issue administrative orders or not to execute judgment against any other persons or entities other than the Companies for liability arising under any statute or common law with respect

to the transportation, storage, treatment, handling, disposal or presence of materials at the Seymour site; and

WHEREAS, it is the intention of the United States or the State to seek additional relief from persons or entities other than the Companies for costs incurred by the United States or the State and for injunctive or other relief to which the United States or the State may be entitled at law or equity arising out of and resulting from the transportation, storage, treatment, handling, disposal or presence of materials at the Seymour site to enable the United States and the State to recover the full relief available to them at law or equity from all parties who may be liable for cost recovery and injunctive or other relief at the Seymour site; and

WHEREAS, the parties recognize and intend to further hereby the public interest in avoiding prolonged and complicated litigation between the parties and to expedite the abatement of a portion of the imminent and substantial endangerment which is alleged to or may be presented at the Seymour site; and

WHEREAS, each undersigned representative of the parties to this Consent Decree certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and to legally bind such party to this document.

Therefore, It is Ordered, Adjudged and Decreed:

### I.

This Court has jurisdiction of this matter and of the parties consenting thereto.

### II.

This Decree applies to and is binding upon the undersigned parties and their successors and assigns. The sole obligations and responsibilities of the Companies, other than Chemical Waste Management, Inc. (hereinafter "CWM"), under this Decree are set forth in Paragraphs III, XI, XIV, XV and XVII herein, and such Companies shall not have any further obligations or responsibilities with respect to the Seymour site other than those under the aforesaid provisions of this Decree. The obligations of CWM under this Decree are set forth in Paragraphs III–XI, XIV, XV and XVII.

### III.

Within fifteen (15) days after the entry of this Decree, the Companies each shall pay to the Seymour Site Trust Fund (hereinafter the "Trust Fund") established at the Merchants National Bank & Trust Company in Indianapolis, Indiana the sum which is shown for that Company in Exhibit A hereto, which payment is not a penalty. One or more of the Companies listed in Exhibit A hereto shall serve as Trustees of the Trust Fund.

### IV.

The Trustees shall use the money in the Trust Fund to pay CWM to perform the Work described in Exhibit B hereto (hereinafter referred to as the "Work"), which Exhibit is hereby incorporated by reference and made a part of this Consent Decree as though it were set forth verbatim. CWM shall be responsible for completion of the Work; and, CWM agrees to assume, and does assume, any and all liability arising out of its acts or omissions in the performance of the Work or its failure to satisfactorily and fully perform and complete the Work as defined in Exhibit B hereto. CWM shall purchase a performance bond in the amount of $15 million dollars, which bond shall assure complete performance of the Work. In event of default the bond shall provide that the Work shall be satisfactorily and fully completed and in no event shall the bond authorize the surety to avoid its obligations to have the work fully completed. CWM shall purchase and maintain in force insurance policies which shall fully protect the United States, the State and the public against any and all liability arising out of its acts or omissions in the performance of the Work. The insurance policies and the performance bond shall contain coverage of the type and in the amounts shown in Exhibits C and D hereto, which coverage has been approved by the United States and the State.

### V.

Subject to obtaining the appropriate federal, state and local permits, CWM shall commence the Work not later than the 30th (thirtieth) day after entry of this Decree and CWM shall undertake and complete the Work expeditiously in accordance with the standards, specifications and the schedule of completion set forth in Exhibit B.

### VI.

No variance shall occur in performance of the Work from the standards, specifications, or schedule of completion contained in Exhibit B without prior written approval by the United States after written notification by CWM to the United States, the State and the Trustees of the nature of and reason for any such requested variance. CWM shall be responsible for obtaining all federal, state or local permits and complying with all applicable federal, state or local laws governing the performance of the Work, including the transportation and disposal of the Materials. CWM shall provide the Court, the United States and the State with a written status report on the progress and completion of the Work every 30 days until the Work is completed.

### VII.

CWM shall be liable for stipulated penalties in the amount of $1,000 (one thousand dollars) for each day on which it fails to complete the performance of the Work in accordance with Exhibit B. Any failure of CWM to complete the Work which results from circumstances beyond the control of CWM shall not be deemed to be a violation of its obligation and shall not make CWM liable for the stipulated penalties. To the extent delay is caused by such circumstances, the time for performance hereunder shall be extended.

CWM shall immediately notify the United States, the State and the Trustees of any delay which occurs in the performance of the Work. Such notification shall be in writing and shall fully describe the nature of the delay, the reasons therefor, the expected duration of the delay, the actions which will be taken by CWM to mitigate further delay and whether the delay may in the opinion of CWM cause or contribute to an endangerment to public health, welfare or the environment. If CWM fails to provide the notice required by this paragraph to the United States it may not receive any extension of time under this decree.

In the event CWM and the United States and the State cannot agree that the time for performance shall be extended, CWM must submit the question to the Court for resolution within a reasonable time or waive its right to receive any such extension. Increased costs or expenses in connection with the performance of the Work shall not constitute a circumstance beyond CWM's control.

### VIII.

The United States, the State and their authorized representatives shall have access to the Seymour site at all times until such time as the Work is completed. The United States Environmental Protection Agency (EPA) may designate an on scene coordinator (osc) to observe and monitor the progress of the Work. The osc shall have the authority vested by 40 C.F.R. 300 *et seq.;* 47 *Fed.Reg.* 31180 July 16, 1982, including authority to require CWM to cease performance of the Work, any portion thereof, or any other activity at the Seymour site which in the opinion of the osc, may or does present or contribute to an endangerment to public health, welfare or the environment or cause or threaten the release of Materials from the site. In the event the osc does require such cessation of work, the osc then shall have the authority to require CWM to perform the Work consistent with Exhibit B in accordance with the instructions of the osc to avoid or mitigate the endangerment which he believes may occur. If CWM objects to any order requiring cessation of the Work or to any order to perform the Work in accordance with the instructions of the osc, it may petition to the Court to stay or set aside the order of the osc. With respect to the subject matter of this paragraph EPA retains all rights under applicable statute or regulations.

## IX.

Until such time as the Work is completed, the United States and the State or their representatives (including the osc) shall have access to the site for the sampling of wastes at the site and to conduct investigations relating to soil and groundwater contamination beneath or near the Seymour site. In conducting such activities the United States or the State or their representatives shall avoid interference with CWM's performance of the Work. CWM agrees to cooperate with the United States and the State by promptly making available to them all information obtained during the performance of the Work by CWM including information relating to the source and identification of Materials removed from the Seymour site. CWM also agrees to preserve all records related to the Seymour site cleanup, including sampling analysis, chain of custody records, manifests, trucking logs, receipts, reports, traffic routing, destination of Materials, correspondence or other documents produced during the Work at the Seymour site and agrees further that it shall make available such documents, along with access to employees with knowledge of relevant facts concerning the performance of the Work for purposes of investigation, information gathering or testimony related to the Work and Materials found at the Seymour site.

CWM agrees to cooperate with representatives of the United States and the State to permit such representatives to take samples including split samples at all locations whether samples are taken at such locations by CWM or not. Sampling and analysis shall be done by all parties pursuant to EPA protocols. Arrangements for such samples shall be made by the osc.

CWM agrees that samples taken shall be handled according to accepted chain of custody procedures established by the National Enforcement Investigation Center to be provided to CWM by the United States. Before disposal of any samples by CWM, the EPA shall be given thirty days notice and opportunity to take possession of these samples.

## X.

CWM shall notify the United States and the State in writing upon the completion of the Work. The Work shall be deemed to be completed when pursuant to the scope of Work in Exhibit B, all materials have been disposed of or treated in accordance with all federal, state and local laws and regulations. Nothing in this decree shall release CWM from liability arising out of or relating to the transportation, treatment, handling, disposal, storage, or releases or threatened releases of Materials at, to, from or near the Seymour site resulting from its performance of the Work. The United States and the State shall review the Work and indicate their agreement or disagreement as to its satisfactory completion within thirty (30) days of receipt of the notification. If neither the United States nor the State advises CWM in writing of any disagreement concerning the completeness of the Work performed within such thirty (30) day period, it shall be deemed that such Work has been completed in full compliance with this decree and the United States and the State shall send a letter to CWM confirming in writing that the Work has been completed.

If the United States or the State believes that the Work has not been completed in accordance with the standards and specifications set out in Exhibit B, they shall notify CWM in writing of what they believe should be done to complete the Work making reference to specific portions of Exhibit B attached hereto and proposing a schedule for completion. If CWM does not object to the corrective measures proposed by the United States or the State within thirty (30) days thereafter, CWM shall expeditiously undertake and complete such measures in accordance with the proposed schedules of completion. If CWM objects to such proposed corrective measures, CWM shall notify the United States and the State within 30 days thereafter of its objections and the reasons therefor. In the event the parties cannot resolve any dispute over whether the Work has been successfully and fully completed, CWM shall submit such dispute to the Court for resolution

within 30 days. Failure of CWM to submit such a dispute to the Court shall mean that CWM waives its objections and CWM shall expeditiously undertake and complete the proposed corrective measures in accordance with the schedule of completion.

## XI.

The Companies agree that they will each preserve, pending further court order, all records and documents in their possession or the possession of any of their divisions, employees, agents, accountants or attorneys, which relate to any transactions or business with, or relate in any other way to Seymour Recycling Corporation or associated parties or the Seymour site, despite any document retention policy to the contrary. The term "associated parties" shall be defined as Seymour Manufacturing Company, Chem-Dyne Corporation, Spray-Dyne Corporation, Transenvironmental Corporation, K.O.I. Petroleum Company, Inc., Bruce A. Whitten, and William L. Kovacs. Notwithstanding any other provision of this decree, the United States retains whatever rights it may have under applicable statutes and regulations, governing the collection of records and documents, which is the subject matter of this paragraph, and the Companies retain whatever rights they may have to object to any requests for records and documents.

## XII.

To avoid litigation between the parties hereto and the expense that would be incurred in connection with such litigation, and to set to rest forever the differences existing among them, without impairing or affecting the claims of the United States, the State and the local governments against any other person or entity in connection with the Seymour site, the United States, the State and the local governments do hereby covenant not to sue, execute judgment or take any civil judicial or administrative action under common law (federal or state), State and municipal law including ordinances of Jackson County, the City of Seymour or the Seymour Aviation Board, and the following federal statutes: Comprehensive Environmental Response, Com-

pensation and Liability Act, 42 U.S.C. § 9601 *et seq.* (CERCLA); Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* (RCRA); Clean Water Act, 33 U.S.C. § 1251 *et seq.* (CWA); The Clean Air Act, 42 U.S.C. § 7401 *et seq.* (CAA); Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.* (TSCA); Safe Drinking Water Act, 42 U.S.C. § 300f. *et seq.* (SDWA); Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et seq.* (FIFRA); the Refuse Act 33 U.S.C. § 407, and any statutes administered or enforced by EPA, against the Companies, their subsidiaries, divisions, parents, affiliates or their respective directors, officers, employees, agents, successors and assigns, arising out of or related to the storage, treatment, handling, disposal, transportation or presence or actual or threatened release or discharge of any materials at, to, from or near the Seymour site, including any action with respect to surface cleanup and soil or groundwater cleanup at the Seymour site. This covenant not to sue, execute judgment or take other action includes all civil, legal and administrative costs incurred by the United States, the State and the local governments with respect to matters which are the subject of this consent decree.

It is expressly understood that the United States, the State and the local governments covenant not to sue, execute judgment, or take any civil, judicial or administrative action against the Companies under common law (federal or state), or federal law, state law or municipal law including ordinances of Jackson County, the City of Seymour and the Seymour Aviation Board for causes of action relating to injury to, destruction of or loss of natural resources of the United States, within the meaning of CERCLA, 42 U.S.C. § 9601 *et seq.*, under the jurisdiction of the United States Department of Interior, arising out of or related to the storage, treatment, handling, disposal, transportation, presence, or actual or threatened release or discharge of any materials at, to, or from or near the Seymour site.

The matters which are the subject of this covenant not to sue or execute judgment

contained in this decree are referred to hereafter as "Covered Matters."

Nothing herein shall be construed to release CWM from any continuing liability at law for its failure to perform the Work in accordance with Exhibit B.

To the extent that the law of the State of Indiana may be determined to control and govern the interpretation of this Consent Decree, the parties do not intend that this paragraph shall be a general, unqualified release as that term is defined by Indiana law. The parties intend that this paragraph shall be construed to be a covenant not to sue, execute judgment or take any civil, judicial or administrative action against only the Companies which are listed in Exhibit A hereto. The parties agree that the successful completion of the Work by CWM does not represent full satisfaction of all claims for relief to which the United States or the State or local governments may be entitled at law or equity against persons or entities other than the Companies arising out of or relating to the storage, treatment, handling, transportation, disposal or presence or actual or threatened release or discharge of any materials at, to, from or near the Seymour site. The parties contemplate and intend that the United States or the State will assert claims for cost recovery, injunctive or other relief against entities which are not parties to this consent decree to enable the United States and the State to recover the complete relief to which they may be entitled at law or equity. To this end, nothing herein is intended to release any claims, causes of action, or demands in law or equity against any person or entity not a party to this Consent Decree for any liability they may have arising out of or relating in any way to the storage, treatment, handling, disposal, transportation, presence or actual or threatened release or discharge of any materials at, to, from or near the Seymour site.

## XIII.

This consent decree was negotiated in good faith by the parties and the United States, the State, and the local governments believe that each of the individual Company's payments described in Exhibit A attached hereto represent a fair and equitable apportionment of each company's responsibilities for Covered Matters. In addition, the United States, the State and the local governments believe that the combined payments of the Companies in Exhibit A represent a fair and equitable apportionment of those Companies' responsibilities for Covered Matters.

Accordingly, the United States and the State intend and believe that each and all of the Companies should not be liable with respect to "Covered Matters" for any payment in excess of the amount paid or commitments made pursuant to this consent decree and agree that this consent decree will be dispositive of each and all of the Companies' duties and liabilities with respect to any other person or entity against whom a claim is made by the United States or the State, or a judgment is rendered in favor of the United States or the State for Covered Matters. To this end, the parties intend to protect each and all of the Companies from being required to pay any amounts for covered matters in excess of the amounts paid pursuant to paragraph III above; to obviate the necessity and expense of having the Companies be or remain parties of record or participate in a suit relating to their liability for "Covered Matters" for the purpose of determining whether they or any of them may be a joint tortfeasor or otherwise additionally liable for "Covered Matters"; to recognize and further the important public policy of settling potential disputes amicably without resort to lengthy litigation, thus expediting the necessary cleanup of the Seymour site; and to protect the rights of the United States and the State from infringement by any person or entity not a party to this Consent Decree. If in any action brought by the United States or the State with respect to Covered Matters, or in any other action arising out of any claim brought by the United States or the State for Covered Matters any court of competent jurisdiction enters a final judgment requiring that one or more of the Companies must pay sums for Covered Matters in addition to those paid by each such Company pursuant to this

Consent Decree, then the United States and/or the State will adjust the total of all such judgments obtained against any other person or entity so that no Company shall be required to pay all or any part of said sum.

### XIV.

The Companies agree not to assert any causes of action, claims or demands against the United States or the State including the Hazardous Substances Response Fund with respect to matters arising out of or relating to the storage, handling, disposal, treatment, transportation or presence or actual or threatened release or discharge of any materials at the Seymour site under the statutes, ordinances or common law referred to in paragraph XII herein. However, the Companies reserve against the United States and the State (but not the Hazardous Substances Response Fund), the right to assert any claim, defense or cause of action arising out of or relating to actions taken by the United States or the State at the Seymour site during or after the performance of the Work.

### XV.

Each Company agrees that in any suit or claim for contribution brought against it for Covered Matters it will timely notify the United States and the State of the institution of any such suit or claim, and it will co-operate with the United States in any such suit or claim.

### XVI.

The United States, the State, the local governments and the Companies, in entering into this Decree and in order to facilitate a mutually satisfactory and immediate cleanup of the Seymour site, do not admit, accept, or intend to acknowledge any liability or fault by any party hereto with respect to any matter arising out of or relating to the Seymour site. This express denial of any and all liability or fault attaches to any and all matters relating to or arising out of the Seymour site.

### XVII.

When notification to the United States is required by the terms of this decree it shall be in writing addressed to: A) Office of Regional Counsel, Region V, United States Environmental Protection Agency, 230 South Dearborn Street, Chicago, Illinois 60604; and B) Chief, Environmental Enforcement Section, United States Department of Justice, Land and Natural Resources Division, Ninth and Pennsylvania Avenue, N.W., Washington, D.C. 20530.

The United States, the State, the local governments and the Companies consent to this decree by their duly authorized representative on this 26th day of October, 1982.

### EXHIBIT A

*List of Companies Contributing to Trust Fund*

| | |
|---|---|
| International Business Machines Corporation | $2,241,001 |
| General Motors Corporation | 1,032,961 |
| E.I. du Pont de Nemours & Company, Inc. | 682,805 |
| General Electric Company | 665,297 |
| Western Electric Company, Inc. | 385,172 |
| United Technologies Corporation | 350,156 |
| Atlantic Richfield Company on behalf of The Anaconda Company, Anaconda Wire & Cable Company, Anaconda Aluminum Company, Anaconda Industries, and Anaconda Magnet Wire | 245,109 |
| Borg-Warner Chemicals, Inc. | 245,109 |
| RCA Corporation | 175,078 |
| Bemis Company Inc. | 175,078 |
| Ford Motor Company | 175,078 |
| Whirlpool Corporation | 140,062 |
| McDonnell Douglas Corporation | 105,047 |
| Dow Corning Corporation | 105,047 |
| Pennwalt Corporation | 100,000 |
| Owens-Illinois, Inc. | 100,000 |
| The Procter & Gamble Company | 100,000 |
| General American Transportation Corporation | 100,000 |
| American Can Company | 100,000 |
| Olin Corporation | 100,000 |
| AM General Corporation | 100,000 |
| Cummins Engine Company Inc. | 100,000 |
| NCR, Corp. | 100,000 |
| Waste Resources of Tennessee, Inc. (an affiliate of Chemical Waste Management, Inc.) | 100,000 |
| | $7,723,000 |

## EXHIBIT B

Exhibit B, entitled "Technical Proposal For The Removal and Disposal of Drummed Hazardous Chemicals and Waste Materials Located at Seymour Recycling Center, Seymour, Indiana" has been omitted from publication by consent of the Court.

## EXHIBIT C

The insurance policies, which CWM shall purchase and maintain in effect shall contain coverage for no less than:

a) Worker's Compensation – Coverage A – Statutory

Coverage B (Employer's Liability) – $500,000

b) Public Liability

Bodily Injury – $500,000/occurrence
$500,000 aggregate

Property Damage – $500,000/occurrence
$500,000 aggregate

c) Automobile Liability

Bodily Injury – $500,000/person
$500,000/accident

Property Damage – $500,000/accident

d) Umbrella Liability

Bodily Injury and Property Damage Combined
$50,000,000/occurrence
$50,000,000 aggregate

Coverage under Umbrella Liability policy applies excess of the limits specified in Coverage B of a), and b) and c) above, and includes coverage for pollution liability from sudden occurrences.

e) Environmental Impairment Liability (Non-Sudden Occurrences)

Bodily Injury and Property Damage Combined
$30,000,000/claim
$60,000,000 aggregate

With respect to CWM insurance policies in existence at the time of execution of this Consent Decree, such insurance policies have been reviewed by and approved by the United States. Certificates of insurance for renewal of CWM insurance policies and binders evidencing renewal shall be forwarded to the United States prior to the expiration date of each insurance policy, and shall be subject to the approval of the United States, which approval shall not be unreasonably withheld.

Copies of renewal policies shall be available for inspection by the United States. Each policy shall contain a provision whereby the insurer agrees not to cancel, terminate, or fail to renew the policy without sixty (60) days prior written notice to the United States and the State.

## EXHIBIT D

*Performance Bond*

Bond No. _____ Amount $15,000,000

## KNOW ALL MEN BY THESE PRESENTS,

That we, CHEMICAL WASTE MANAGEMENT, INC., (hereinafter called the "Principal"), as Principal, and the FEDERAL INSURANCE COMPANY, of Short Hills, New Jersey, a corporation duly organized under the laws of the State of New Jersey, (hereinafter called the "Surety"), as Surety, are held and firmly bound unto the UNITED STATES OF AMERICA and the STATE OF INDIANA (hereinafter called the "Obligees"), in the sum of Fifteen Million Dollars ($15,000,000), for the payment of which sum well and truly be made, we, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally firmly by these presents.

Sealed with our seals and dated this _____ day of _____, A.D. nineteen hundred and _____.

THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the Principal entered into the Consent Decree with the Obligees to which this Performance Bond is attached, and has agreed to perform the work described in Exhibit B of this Consent Decree, which is hereby referred to and made a part hereof as if fully set forth herein;

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly keep, do and perform each and every, all and singular, the matters and things in said Exhibit B set forth and specified to be by said Principal kept, done and performed, at the times and in the manner in said Exhibit B specified, or shall pay over, make good and reimburse to the above named Obligees, all loss and damage which said Obligees may sustain by reason of failure or default on the part of said Principal so to do, then this obligation shall be null and void; otherwise shall remain in full force and effect.

NOTWITHSTANDING the above, it is expressly understood that in the event of default, the Surety shall satisfactorily and fully complete the work described in Exhibit B, and in no event shall the Surety be authorized to avoid its obligation to have the work in Exhibit B completed. Such obligation to complete the work shall be limited, however, to the penal sum of the Bond in the aggregate for both Obligees.

Principal

By: _____

FEDERAL INSURANCE COMPANY