Pursuant to the memorandum opinion filed herein on this date,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment in this action be entered in favor of defendants and against plaintiffs. The Court further declares Section 188.080, R.S.Mo. (1986), to be constitutional. Plaintiffs' request for injunctive relief is accordingly denied.

**UNITED STATES of America, Plaintiff,**

v.

**CONSERVATION CHEMICAL COMPANY, et al., Defendants/Third–Party Plaintiffs,**

v.

**GENERAL DYNAMICS CORPORATION, et al., Third–Party Defendants.**

Civ. No. 82–0983–CV–W–5.

United States District Court, W.D. Missouri, W.D.

Feb. 23, 1988.

Kenneth Josephson, Asst. U.S. Atty., Kansas City, Mo., John R. Barker, Environmental Enforcement Section, Land Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., Ken Weinfurt, Asst. U.S. Atty., Kansas City, Mo., John Wittenborn, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Niewald, Waldeck, Norris & Brown, Michael E. Waldeck, John L. Hayob, Terry L. Karnaze, Kansas City, Mo., for Conservation Chemical, CCC of Ill. and Norman Hjersted.

Thos. F. Fisher, John M. Kilroy, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., Edmund B. Frost, John A. Zackrison, Kirkland & Ellis, Washington, D.C., Robert F. St. Aubin, FMC Corp., Philadelphia, Pa., for FMC Corp.

Neil D. Williams, Overland Park, Kan., James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Allan J. Topol, Patricia A. Barald, David F. Williams, Covington & Burling, Washington, D.C., for IBM Corp.

Richard F. Adams, Ben R. Swank, Jr., John J. Williams, III, Slagle & Bernard, Kansas City, Mo., for third party plaintiffs.

Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., John R. Cleary, Darwin Johnson, Wm. Session and Robert J. Bjerg, Kansas City, Mo., for Norman Hjersted.

J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, Martin J. Purcell, Robert M. Kroenert, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Daniel W. Kemp, Legal Dept., Armco, Inc., Middleton, Ohio, for Armco, Inc.

Jerome T. Wolf, Carl H. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., John A. McKinney, Morton I. Zeidman, Alan R. Chesler, New York City, for AT & T Tech. Inc.

Stephen Jacobson, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for Mobay.

## MEMORANDUM OPINION AND ORDER

### SCOTT O. WRIGHT, Chief Judge.

On November 23, 1987, a hearing was held to consider approval of the Consent Decree submitted on June 16, 1987[1], by Armco, Inc. ("Armco"), AT & T Technologies, Inc. ("AT & T"), FMC Corporation ("FMC"), and International Business Machines Corporation ("IBM") (collectively "Original Generator Defendants" or "OGDs"), and Defendants Conservation Chemical Company ("CCC"), Norman B. Hjersted ("Hjersted"), and Conservation Chemical Company of Illinois ("CCCI") (collectively "CCC Defendants"), and Plaintiff United States (hereinafter "the United States").

The hearing was conducted *inter alia* to allow presentation of evidence to support substitution of the hydraulic containment ("pump and treat") remedy[2] contained in the proposed Consent Decree in lieu of the source isolation ("slurry wall") remedy included in the Preliminary Agreement approved by the Court in 1985 as well as to determine whether such newly proposed remedial action was legal, fair and reasonable and otherwise in compliance with the National Contingency Plan.[3]

For the reasons hereinafter stated, the Court finds that pursuant to Rule 42 of the Federal Rules of Civil Procedure, the hydraulic containment remedy should be substituted for the previously approved source isolation or "slurry wall" remedy, but that the Consent Decree as submitted must be further conditioned to assure that it is legal, fair, and reasonable and thus appropriate for final approval by the Court.

### I. *Background.*

On May 25, 1985, the OGDs and the United States advised the Court that a settlement had been reached whereby the OGDs would implement a remedy at the Conservation Chemical Company Site ("CCC Site" or "Site") and the United States would settle its claim for past response costs. The arrangement was set out in a document entitled "Preliminary Agreement," and called for a remedy generally consisting of surface cleanup and a "cap," flood protection for the Site, off-site ground water monitoring, a wall extending from bedrock under the Site to the surface "cap" completely encircling the Site, and an interior withdrawal well to prevent contaminants from leaking through the wall or underlying bedrock out of the contaminant area.[4]

On August 2, 1985 the United States and OGDs filed the Preliminary Agreement with the Court. (A Supplement was filed August 29, 1985, and First and Second Amendments were subsequently made on December 24, 1985 and January 22, 1986, respectively). A Federal Register notice was thereafter published regarding the Preliminary Agreement, as amended, and public comment was invited.

On October 21, 1985, the Court conducted a hearing concerning the Preliminary Agreement and the suggested remedial action to cleanup the CCC Site. Based upon evidence and testimony received at the October 21, 1985 hearing, the Court found that the "slurry wall" remedy recommended in the Preliminary Agreement was legal, fair, and reasonable following the

---

**1.** The proposed Consent Decree was lodged with the Court on November 23, 1987 pursuant to 28 C.F.R. § 50.7.

**2.** *See,* Exhibit A attached to Consent Decree for a complete description of the hydraulic containment remedy; see also, Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for the Conservation Chemical Company Site" at 4.1–4.10 (March 1987), for a description and comparative evaluation of the hydraulic containment and "slurry wall" remedies.

**3.** *See,* Order of the Court dated September 18, 1987.

**4.** *See,* Plaintiff's Exhibit 10, Cullinane and Crabtree, "Focus Feasibility Study for Conservation Chemical Company Site," at 7.11–7.27 (1985), for a more complete description of the source isolation or "slurry wall" remedy.

factors outlined in *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1337–1338 (S.D.Ind.1982).[5] On December 12, 1985, the Court entered a Memorandum Order approving the "slurry wall" remedial action proposed in the Preliminary Agreement. *See, United States v. Conservation Chem. Co.*, 628 F.Supp. 391 (W.D.Mo.1985). In its Order, the Court found that the source isolation or "slurry wall" remedial action was consistent with the National Contingency Plan ("NCP"), Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a)(1)–(4)(B),[6] as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA) and directed the parties to prepare "forthwith" a Consent Decree incorporating the approved "slurry wall" remedy for subsequent consideration by the Court.[7]

Following Court approval of the remedy proposed by the Preliminary Agreement, statements were made by counsel for the OGDs at hearings, in written motions and memoranda that unexpected and previously unknown geologic conditions and subsurface anomalies had been encountered at the CCC Site which cast some doubt upon the ultimate efficacy and appropriateness of the approved "slurry wall" remedy. The concern centered around the discovery that bedrock on the northwest side of the CCC Site extended down over one hundred (160) feet whereas the maximum depth anticipated had been approximately one hundred (100) feet. It was further suggested that unanticipated geologic conditions, including fractured bedrock with large voids, the existence of large boulders and cobble size materials, and increased permeability[8] might render the previously-approved "slurry wall" remedy unreasonable,[9] technically impossible or financially catastrophic.

The United States apparently disagreed with the OGDs' statements concerning the technical feasibility of the "slurry wall" remedy and its overall implementability, and sought to compel performance of the "slurry wall" remedy by filing a "Motion to Enforce the Preliminary Agreement Between the United States and the Original Generator Defendants."

**5.** The *Seymour* opinion is instructive because it not only discusses the legal standards by which a federal court should review a proposed consent decree, it also provides a useful example of the consent decree process in the context of a Superfund cleanup case. With regard to the legal standard by which a federal court should review a consent decree, the court said:

> In deciding whether to approve a proposed decree, a court must inquire whether the decree is consistent both with the Constitution and with the mandate of Congress. *See United States v. Ketchikan Pulp Co.*, 430 F.Supp. 83, 86 (D.Alaska 1977); *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y.1982). Second, the court 'must assure itself that the terms of the decree are fair and adequate.' *See United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. at 1072. Finally, the court must inquire whether the settlement is a reasonable one. *See In re Corrugated Container Antitrust Litigation*, 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982), *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). The underlying purpose of the court in making these inquiries is to determine whether the decree adequately protects the public interest. *United States v. Ketchikan Pulp Co.*,

*supra*, 430 F.Supp. at 86. The court 'must eschew any rubber stamp approval in favor of an independent evaluation,' *United States v. Hooker Chemicals and Plastics Corp., supra*, 540 F.Supp. at 1072, but because of the clear public policy favoring settlements, the court must not substitute its judgment for that of the parties. See, *Airline Stewards v. American Airlines*, 573 F.2d 960, 963 (7th Cir.1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190.
554 F.Supp. at 1337–1338.

**6.** National Oil and Hazardous Substance Pollution Contingency Plan, 40 C.F.R. § 300.

**7.** *United States v. Conservation Chem. Co.*, 628 F.Supp. at 404.

**8.** *See generally*, Transcript of Proceedings before Special Master, at 38–70, July 8, 1987.

**9.** Section 121 of CERCLA, as amended by SARA, establishes a preference for remedies employing treatment technologies which permanently and significantly reduce the mobility, toxicity or volume of waste. 42 U.S.C. § 9621. The source isolation or "slurry wall" remedy arguably does not satisfy this preference to the same degree as the hydraulic containment remedy now proposed.

After denial of the motion by the Court,[10] the United States continued discussions with the OGDs, and thereafter they agreed upon an alternative plan for remediation of the CCC Site based upon hydraulic containment.[11]

On June 16, 1987, a Consent Decree, incorporating the hydraulic containment or "pump and treat" remedy, was submitted to the Court by the United States, OGD's, and CCC Defendants. The proposed Consent Decree was offered to the Court in settlement of the litigation between the parties under Section 122[12] of CERCLA, 42 U.S.C. § 9622, as amended by SARA.[13]

Because the Consent Decree contained a remedy different from that previously approved, the Court ordered the Special Master to conduct a hearing to review the proposed Consent Decree and to hear testimony regarding the feasibility of the hydraulic containment remedy. The Order also directed the Special Master to file a Report and Recommendation as to whether the Consent Decree should be published in its proposed form or whether amendments should be made prior to publication.

The Special Master conducted two days of hearings on July 8 and July 9, 1987, at which a total of twenty-one exhibits were introduced and testimony was received from four witnesses (Paul A. Hustad, Chief Geotechnical Engineer with Burns & McDonnell in Kansas City, Missouri; Steven P. Larson, a hydrogeologist with S.S. Papadopulous & Associates, Inc. in Rockville, Maryland; Dr. Charles R. Faust, a hydrogeologist with GeoTrans, Inc. in Herdon, Virginia; and Eugene B. Hamlin, a construction engineer in Bellevue, Washington). See, Special Master's "Report and Recommendations Concerning The Proposed Consent Decree," at 9–10 (August 12, 1987).

Most of the July 8 and 9, 1987 hearing before the Special Master was occupied by testimony concerning unexpected difficulties and conditions encountered at the CCC Site as well as the rationale for substituting the "pump and treat" remedy for the previously approved "slurry wall" remedy. See, Transcript of Hearing, Vol. I at 19–204 and Vol. II, at 207–306.

Briefly stated, because of concerns that the relatively difficult to construct and costly "slurry wall" might not effectively reduce the amount of contaminated groundwater to be removed, the OGDs investigated the substitution of the "slurry wall" with an increase of pumping of groundwater to contain the contaminants, i.e. hydraulic containment. (Transcript of Hearing, Vol. I, at 82–93). Expert hydrogeologists retained by both the United States and OGDs testified that hydraulic containment was an established technology which could achieve one hundred percent capture of groundwater, even under flood conditions. (Transcript of Hearing, Vol. I, at 95–96, 123–124, 133, 148–149, 158, 186, 191–192, 194, 226–227, 230–231, 274 and 287–288). Testimony further indicated that the "pump and treat" remedy under certain circumstances might have some cost advantage over the "slurry wall" remedy. (Transcript of Hearing, Vol. II, at 249–250 and 272–273).

On August 12, 1987, the Special Master filed a "Report and Recommendations Concerning The Proposed Consent Decree." Among other things, the Special Master found that although insufficient evidence had been presented to establish conclusively that the "pump and treat" remedy should be substituted for the previously approved "slurry wall" remedy, the evidence presented at the hearing was adequate to suggest that the hydraulic con-

---

10. See, United States v. Conservation Chem. Co., 661 F.Supp. 1416 (W.D.Mo.1987).

11. Various remedial alternatives generally utilizing hydraulic containment had been studied and evaluated in Plaintiff's Exhibit 10, Cullinane and Crabtree, "Focus Feasibility Study for Conservation Chemical Company Site," at 6.5–6.6 and 7.27–7.32 (1985).

12. Section 122 of CERCLA/SARA generally authorizes the President to enter into an agreement with respect to the settlement of claims for response costs as part of a consent decree to be entered by the appropriate court. 42 U.S.C. § 9622.

13. Pub.L. No. 99–499, 100 Stat. 1613 (1986). SARA was enacted October 17, 1986.

tainment remedy might be more technically effective than the original remedy. The Special Master recommended that a full hearing be conducted by the Court to determine if the Consent Decree and the newly-proposed hydraulic containment remedial action were legal, fair and reasonable. The Special Master advised the parties that they should be prepared to offer evidence at the recommended judicial hearing relating to sixteen specific areas to support substitution of remedies. Lastly, the Special Master recommended that the proposed Consent Decree, as amended through July 15, 1987, be published for public comment.[14]

By Order dated September 18, 1987, the Court adopted the Special Master's Report and Recommendations. The Court's Order provided, *inter alia*, that pursuant to Section 122(d)(2) of CERCLA/SARA, 42 U.S.C. § 9622(d)(2) and 28 C.F.R. § 50.7, the United States file with the Court and publish in the Federal Register the proposed Consent Decree,[15] as amended, and that a hearing be held beginning on November 23, 1987 to consider the proposed Consent Decree and at which the parties should "present evidence to support a substitution of the 'pump and treat' remedy for the 'slurry wall' remedy." (September 18, 1987 Order, at 3). In addition, the Order stated:

> ORDERED that pursuant to Rule 42, Federal Rules of Civil Procedure, the original complaint and third-party complaints are called for hearing concurrent with the hearing referenced above for purposes of ruling on whether the remedial action in the proposed Consent Decree is legal, fair and reasonable; whether the plaintiffs, [sic] original generator defendants and CCC defendants have incurred, or will incur costs for which they may seek contributions from the third-party defendants pursuant to 42 U.S.C. § 9607 or 42 U.S.C. § 6973, and whether any such response costs associated with the remedial action in the proposed Consent Decree are consistent with the na-

tional contingency plan within the meaning of 42 U.S.C. § 9607(a)(1)–(4)(B).

The hearing called for by the Court's September 18, 1987 Order was held and completed on November 23, 1987, with the following parties in attendance: Plaintiff United States; Defendants CCC, CCCI, and Hjersted; Original Generator Defendants/Third–Party Plaintiffs Armco, AT & T, FMC, and IBM; third-party defendant Trico; third-party defendant Midland–Ross; third-party defendants Hartford, Evanston, Mutual Fire & Lincoln Insurance Companies; third-party defendants Beach Aircraft Corp., Schwinn Bicycle Company and TRW Inc.; third-party defendant Solid State Circuits; third-party defendant AB Chance Co.; third-party defendant General Dynamics; third-party defendants Gulf Oil Corporation, Gulf Research & Development, Chevron USA, and Syntex Agribusiness; and third-party defendant Atwood Enterprises. Also present were representatives of third-party defendants Kansas City Power and Light Company ("KCP & L"), Mobay Chemical Company ("Mobay"), liaison counsel for the third-party defendants, liaison counsel for the third-party defendant insurance companies, the Environmental Protection Agency (Region VII) (EPA), Special Master Professor Robert H. Freilich and his partner, Neil R. Shortlidge, of the Freilich, Leitner, Carlisle & Shortlidge law firm, and the Court-appointed engineering expert Dr. Roy O. Ball, P.E. of ERM–Northcentral Inc. In addition, Jeff Gardner, a representative of the Water Department of the City of Independence, Missouri, and Rick Johnson, an employee of the City of Kansas City, Missouri Pollution Control Department also attended the hearing.

Immediately prior to the actual hearing, counsel for the United States and Original Generator Defendants announced that a stipulation had been drafted whereby the OGDs agreed to keep a minimum balance of $1 million in the Court-administered

---

**14.** *See,* Special Master's Report and Recommendations, at 54–57 (August 12, 1987).

**15.** The proposed Consent Decree was lodged with the Court on November 23, 1987, and published in the Federal Register on November 30, 1987 (52 F.R. 45510, November 30, 1987).

fund so that if there were an interruption in normal funding of the proposed remedy, funds would be available to operate the Site plant for at least one year. (Transcript of November 23, 1987 hearing, at 8–10). The OGDs also reported that negotiations with KCP & L had been concluded and that they expected to have a draft of the Site access easement with KCP & L before the conclusion of the hearing. The OGDs reported that a basic agreement had also been reached with Mobay and hoped to have a draft easement by week's end. (Transcript of November 23, 1987 hearing, at 10–11).

The United States presented evidence through the testimony of four expert witnesses: Dr. Charles R. Faust, executive vice president and principal hydrogeologist of GeoTrans, Inc.; Donald F. Cooley, a chemical engineer employed by Black & Veatch Engineers and Architects; Murdock J. Cullinane, Jr., a research civil engineer employed by the United States Army Corps of Engineers Waterways Experiment Station in Vicksburg, Mississippi; and Robert L. Morby, Superfund Branch Chief for the Hazardous Waste Management Program of Region VII of the United States Environmental Protection Agency. In addition to the testimony of the listed expert witnesses, the United States offered eighteen exhibits, which were received into evidence without objection: the affidavit of publication of the "Notice of the Hearing" in the *Kansas City Star* and the *Kansas City Times;* a diagram of the generalized geologic section of the CCC Site; a diagram of the concept of hydraulic gradient; a diagram of the groundwater flow direction for the CCC Site; a diagram showing the concept of hydraulic control for the CCC Site; an aerial map of the CCC Site; an aerial map of the CCC Site showing approximate extent of the complete capture zone; a diagram showing the percentage of capture for the CCC Site; an overlay to the aerial map of the CCC Site; the Record of Decision (ROD) of remedial alternative selection for the CCC Site prepared by the United States EPA; the 1985 Focus Feasibility Study; the 1987 Addendum to the Focus Feasibility Study; a table of theoretical

solubilities for various metals; the professional resume of Murdock J. Cullinane; the professional resume of Charles R. Faust; a letter dated November 20, 1987 from Dr. Frederick Brunner, Director of the Missouri Department of Natural Resources, to Morris Kay of the United States EPA; an affidavit of publication in the Federal Register; and a Draft Final Report dated July 28, 1987 prepared by GeoTrans, Inc. entitled "Numerical Simulation of Pumping and/or Injection Alternatives for Remedial Action at the CCC Site, Kansas City, Missouri."

The Original Generator Defendants/Third–Party Plaintiffs presented testimony from Steven P. Larson of S.S. Papadopulos and Associates; Dwight G. Robinson of Burns & McDonnell Engineering Co., and Dr. Paul A. Hustad of Burns & McDonnell Engineering Co. Each of the above was qualified as an expert in various fields, and offered uncontroverted expert testimony. The OGDs also offered into evidence fourteen exhibits which included: a resume of Steven P. Larson; an aerial photograph of the CCC Site; a site plan for the CCC Site; a typical floor plan for a waste water treatment plant; a flow diagram of the various treatment processes and units within an industrial waste water treatment plant; photographs of various components within an industrial waste water treatment plant (metal removal system, sludge condensing or thickening tank, filter press, biological reactor, granulated activated carbon unit, and pressure filter system); a diagram of a sulfide reactor; a letter dated October 30, 1978 from John J. Williams III to Stephen J. Owens relating to CCC Site costs for a thirty year period; and a report entitled "Measurement of Inward Gradients Conservation Chemical Company Site Kansas City, Missouri, March 25, 1987." Each of the exhibits was received into evidence without objection. No other parties presented evidence by way of testimony or exhibits although the transcript of the July 8 and 9, 1987 hearing before the Special Master was available to the Court and was considered evidence regarding the proposed Consent Decree.

*See,* Court's Order of September 18, 1987, at 3.

Immediately after the conclusion of the last witness' testimony, the Court noted that there had not been any testimony or discussion regarding a method to apportion response costs in excess of the $15 million "cap." Counsel for the Original Generator Defendants/Third–Party Plaintiffs stated that some settlement discussions had taken place with the Third–Party Generator Defendants and requested until the end of January, 1988 to engage further in settlement discussions. The Court indicated a willingness to give the Original Generator Defendants/Third–Party Plaintiffs and Third–Party Generator Defendants until the end of January, but admonished the parties that they "really ought to try to settle it. And then if you don't have it settled by January the 30th, well then we'll just assume there's no way it can be settled...." (Transcript of November 23, 1987 Hearing, at 206).

On November 30, 1987, the Court issued an Order listing several major concerns (long term funding, site access, and apportionment of costs in excess of the dollar cap) regarding the proposed Consent Decree. The order stated that the Court "will not consider approval of the proposed Consent Decree unless it is satisfied that these concerns have been, or will be, adequately addressed." Order of November 30, 1987, at 2. In particular, the Court ordered submission to the Court of a proposed order stipulated to by all the parties to the Consent Decree regarding the assurance of long term funding [16] for the remedial action, all easements necessary for the proper and complete performance of the Consent Decree [17] together with a stipulation authorizing recording of such instruments on the date of entering the Consent Decree, and lastly:

ORDERED that not later than January 29, 1988, liaison counsel for the third-party plaintiffs and the third-party generator defendants shall advise the Court and the Special Master, in writing, whether (1) the parties have reached an agreement concerning the apportionment of the costs of remedial action and other response costs or (2) having failed to reach such agreement, the parties stipulate to waiving a trial on liability and agree to proceed to a hearing on apportionment before the Special Master, or (3) having failed to agree to a waiver of a trial on liability, that the parties elect to have a trial on liability and a subsequent apportionment hearing. In the event the first alternative is indicated, the Court will thereafter schedule a hearing on the proposed settlement agreement. In the event that the second or third alternative is indicated, the Court directs the Special Master to submit a recommendation outlining a suggested prehearing or pre-trial schedule, as appropriate.

On or about December 14, 1987, a "Stipulation and Agreement" was filed by the United States and Original Generator Defendants and approved by the CCC Defendants. This "Stipulation and Agreement" presumably was drafted to comply with the Court's November 30, 1987 Order. The Stipulation and Agreement provides:

Paragraphs B and C of Section V of the proposed Consent Decree require original generator defendants to maintain sufficient money at all times in the Fund to assure the uninterrupted progress of the Remedial Action. Original generator defendants are required to project cash flow needs for each succeeding six-month period. Original generator defendants are obligated to replenish the Fund as necessary to assure the Fund

---

16. At the November 23rd hearing, Dr. Charles R. Faust stated that the "pump and treat" remedy will have to operate "many 10s of years" (Transcript of November 23, 1987 hearing, at 67); while Plaintiff's Exhibit 11, the FFS Addendum, indicates that the cleanup process could "take scores and even hundreds of years." (p. 4.6). This evidence, in the Court's opinion,

makes long-term funding of the remedy critical to the successful remediation of the CCC Site.

17. KCP & L and Mobay own property adjacent to the CCC Site, and access to the CCC Site across one or both properties is apparently necessary for the complete performance of the remedy contemplated by the Consent Decree.

contains six months' cash flow requirements.

Original generator defendants and plaintiff hereby stipulate and agree that *original generator defendants shall maintain a minimum of $1 million in the Court-administered Fund,* which amount, until such time as original generator defendants' cash flow projections show a need for funding in excess of said minimum, shall be deemed to be adequate to assure the uninterrupted progress of the Remedial Action for at least a six-month period.

The amount of the minimum balance to be maintained in the Court-administered Fund may be increased or decreased from time to time on motion of any party in interest for good cause shown, or by agreement of the parties with approval of the Court. (emphasis added).

On December 21, 1987, the OGDs submitted to the Court, for its review and approval, a non-exclusive Easement granted by KCP & L to Front Street Trust [18] and the United States for ingress and egress for pedestrians and vehicles over, under and upon KCP & L's property incidental or occasioned by "Front Street's installation, operation, maintenance, inspection, repair, replacement and possibly relocation of such recovery wells, monitoring wells, piezometers, water discharge pipeline and other monitoring or remedial devices." The Easement is executed by KCP & L, but is not signed by "Front Street Trust" and/or the OGDs. The lack of execution by the OGDs is alleged to be on account of "a delay in the formation of the 'Front Street Trust,' due to recently discovered complications under Missouri trust law," although the OGDs contend the terms of the Easement are acceptable to the OGDs and United States. No stipulation as to recording the Easement was submitted or referred to.

On December 31, 1987, the Original Generator Defendants filed another "Response." Submitted with the Response was an unsigned non-exclusive Easement granting access to Mobay's property necessary for the implementation of the remedial actions required by the Consent Decree. The terms of the Easement were represented to be acceptable to both parties, and the "Response" indicates that the Easement was not executed by Mobay "due to the absence of corporate officials during the Christmas holidays," and was not executed by the OGDs because of "recently discovered complications under Missouri Trust law." In addition, the Response states that the United States may request changes in paragraph 16 of the Easement relating to the maintenance of insurance although the United States concurs with the OGDs and Mobay that "the form of the Easement is in sufficiently final form that it may be presented to the Court." As with the KCP & L Easement, no stipulation regarding filing was included.

On January 29, 1988, the Original Generator Defendants/ Third–Party Plaintiffs and Third–Party Defendant Generators filed a "Joint Report" stating that no complete or partial settlement on the issue of response cost apportionment has been reached although settlement negotiations among the parties are continuing in an effort to resolve disputes before substantial efforts and resources are expended.

## II. *Findings of Fact.*

The following excerpted facts are taken from the "Record of Decision" prepared by the United States EPA, which was admitted into evidence at the November 23, 1987 hearing (Plaintiff's Exhibit 9), and the "Focus Feasibility Study For Conservation Chemical Company Site" (Cullinane and Crabtree, 1985) which was also admitted into evidence (Plaintiff's Exhibit 10). Neither exhibit was rebutted nor controverted. Such facts are therefore taken as true by the Court:

"The Conservation Chemical Company (CCC) site is located at 8900 Front Street,

18. The proposed access easement is between KCP & L and the "Front Street Trust," rather than the OGDs. No such trust has been formed, and the OGDs have not submitted the trust agreement to the Court or the United States for determination that the trust agreement is satisfactory.

within the city limits of Kansas City, Missouri. The site is located approximately 1.75 miles east of Interstate 435, along the Levy Road in Jackson County, Missouri. The site is approximately six (6) acres in size and is situated on the floodplain of the Missouri River near the confluence of the Missouri and Blue Rivers, on the river side of the levy. The only access to the site is from the Levy Road.

"The area in which the site is located is industrially zoned. Mobay Chemical Company (MCC) operates an agricultural chemical manufacturing plant southwest of the site and owns property northeast and east of the site, which is undeveloped, but a portion of which has in the past been used for agricultural purposes. Kansas City Power and Light (KCPL) operates the Hawthorne Power Plant to the northwest of the site and owns undeveloped land to the north and west of the site.

"Generally, the site is underlain by the Missouri River alluvium which is composed of silt, sand, and gravel.[19] This aquifer is used as a source of drinking water by both private residents and public water supply companies. The water table is encountered below the site at depths ranging from 5 to 13 feet below the ground surface. The alluvium generally ranges in depth from about 70 to 110 feet. Recent investigations indicate the depths north of the site ranges up to 160 feet. The bedrock underlying the alluvium is comprised of interbedded shale, limestone, and sandstone.

"Generally, the water table slopes towards the Missouri River and exhibits a low hydraulic gradient. During this condition, the groundwater in the upper layers of the aquifer provides recharge to the Missouri River. The water table gradient and ground water flow direction can be altered during high stages of the Missouri River. Wastes at the site can become saturated by the water table.

19. Although not offered as evidence at the November 23, 1987 hearing, a detailed description of the Site hydrogeology is found in reports entitled "Hydrogeologic Characterization Conservation Chemical Site" by Crabtree and Ma-

"The CCC site is southwest of the confluence of the Blue River and the Missouri River. The average annual discharge of the Missouri River, based on a 78–year average, is about 55,000 cubic feet/second (cfs) with extremes of 573,000 cfs and 1,500 cfs. Actual extremes are generally much less with a low flow occurring in late fall and winter and a high flow in the spring. The 7–day, 10–year low flow in the river is approximately 8,447 cfs.

"CCC initiated its activities at the site in 1960 beginning with construction of chemical treatment basins, the processes area and a roadway ramp. The U.S. Army Corps of Engineers, Kansas City District, issued a permit to CCC pertaining to this site. The permit was expressly limited to issues related to the public rights of navigation.

"Waste disposal operations began at the site soon after site construction was initiated and continued until approximately 1980. The exact nature and quantities of chemical and waste handled during the site's active operating period are unknown. Many site operating records are reported to have been destroyed in a fire in 1970. Operating records which are available indicate that the primary materials accepted at the CCC site included organics, solvents, acids, caustics, metal hydroxides, and cyanide compounds. Reports also indicate that pesticides, herbicides, waste oils, organic solvents, halogenated compounds, arsenic and elemental phosphorus were handled at the site. In addition, there are reports and some evidence that pressurized cylinders and other metal containers were placed in the lagoons. The facility handled liquids, sludges, and solids.

"Based upon the available site operating records, it has been estimated that the following quantities of materials were brought to the site:

Acid Metal–Finishing Wastes: 32.6 million gallons
Alkaline Metal–Finishing Waste: 10.3 million gallons

lone (1984), and "Endangerment Assessment: Conservation Chemical Company" by Clement Associates (1985); *see also,* Transcript of November 23, 1987 hearing at 19–24.

| | |
|---|---|
| Cyanides: | 0.4 million gallons + 38.44 tons |
| Solvents/Organics: | 1.7 million gallons |
| Miscellaneous Wastes: | 0.7 million gallons + 314 tons |
| Refinery Wastes: | 2.5 million gallons + 719 tons |
| Arsenic/Phosphorus Wastes: | 2540 tons |

"The above totals include 48 million gallons of liquids and sludges and 1,144 tons of solids, i.e., roughly 300,000 tons in total. Because the records are incomplete, these figures are believed to understate the total quantity of materials brought to the site.[20]

"Most of the materials brought to the site reportedly were disposed of onsite, with or without treatment. According to the site operator, the principal exceptions are the cyanides, some of which reportedly were converted to HCN and released or burned, and solvents, most of which reportedly were either incinerated or reclaimed. However, there is evidence from inventories that substantial quantities of organic solvents may have been disposed of onsite.

"CCC employed a variety of waste handling practices, including but not limited to solvent incineration, solvent resale, pickle liquor neutralization, cyanide complexation, chromic acid reduction, and ferric chloride/ferric sulfate recovery. Residual materials from the various treatment processes were generally disposed of onsite in the basins. Drums, bulk liquids, sludges, and solids were buried at the site. Some wastes, such as drummed cyanide waste and arsenic and phosphorus containing wastes, were disposed of onsite without treatment.

"Estimates based upon the surface areas of the lagoons (approximately 139,500 sq. ft.) and reported lagoon depths (up to 18 feet below the surface of the site) indicate that approximately 93,000 cubic yards of materials are buried onsite. Native materials beneath and adjacent to the disposal areas were probably contaminated by the waste disposal operations.

"In 1975, the Missouri Department of Natural Resources, Solid Waste Management Program (DNR/SWMP) investigated the site and found it to be operating as a solid waste disposal area. On December 15, 1975 DNR/SWMP requested that CCC cease the disposal of solid waste at the site and that remedial actions be taken to clean up the site.

"In 1977 the Missouri Clean Water Commission ordered the site closed and covered. Beginning in approximately 1978, CCC initiated a site closure process which involved an attempt to stabilize the upper layer of waste materials in the basins, which was followed by placement of a soil cover over the basins. The process raised the surface elevation of the site to approximately current levels. A topographic map prepared from aerial photographs taken in March 1984 depicts the current topography. The surface of the site slopes generally from the southwest to northeast. However, slight irregularities in the surface result in depressions which collect precipitation. The area surrounding the site currently slopes to the northeast, northwest, and southeast, so that surface drainage from the site is in these three directions. A plan for closure of the CCC site was submitted in June 1979 which called for the addition of absorbents and cementing materials to the waste in the uppermost 5 feet of each basin. Waste acids, predominantly pickle liquor, and fly ash were mixed with the upper layer of waste materials in the basins. Tests conducted on samples of the "stabilized" wastes in 1985 indicated that the desired pozzolonic cement-like properties had not formed. Also, there are indications that this material had deteriorated and will continue to deteriorate.

"In 1979, the U.S. Environmental Protection Agency (EPA) investigated the area and found that ground-water contamination had occurred in the vicinity of the site. The EPA installed nine shallow (15–24 ft) monitoring wells. These wells were installed to collect water level data and ground-water samples for chemical analysis. The results of this investigation were summarized by Herndon and Sisk (1980). Water level monitoring at these wells has been performed periodically since 1979 and monthly since June 1983.

**20.** *See also, United States v. Conservation Chem.* *Co.,* 619 F.Supp. 162, 182–84 (W.D.Mo.1985).

"Remediation of this site has been the subject of ongoing litigation since September 1980, when the United States first sued Conservation Chemical Company. In November 1982, a separate Complaint was filed against not only Conservation Chemical Company but also its president, a related corporation, and four companies believed to be the largest contributors of the contaminants of greatest concern at the site. The 1980 Complaint was subsequently dismissed.

"In 1983, the EPA, through its FIT contractor Ecology and Environment, Inc., conducted field investigations at the CCC site. These investigations included the installation of 24 additional monitoring wells around the periphery of the site. Geophysical surveys, including vertical and horizontal resistivity traverses and a shallow seismic reflection survey were also conducted. In addition, soil and ground-water samplings and analyses were performed.

"Also in 1983, the U.S. Army Engineers Waterways Experiment Station was tasked by the EPA to review exiting data, collect and analyze additional data as required, and develop a detailed characterization of the wastes and hydrogeologic regime at the site. This tasking has resulted in a series of additional and ongoing exploration and data analysis projects. In addition, the WES provides general consultation regarding technical aspects of remedial technologies and alternatives applicable at the site.

"In 1984, approximately 250 third-party defendant generators, insurance companies and government agencies were brought into the lawsuit by the original defendants. Most of the claims involving third party defendants have now been settled.

"In September and October 1984, a Remedial Investigation (RI) was conducted. The primary objectives of the RI were to: characterize the materials contained in the basins at the site, estimate the approximate quantities of materials in the basins, evaluate the types and quantities of chemicals migrating from the basins, assess the effects of such migration on potential receptors, and provide adequate data to support development of an endangerment assessment and feasibility study also being prepared for the site. The RI was completed in November 1984.

"The U.S. Army Engineers Waterway Experiment Station (WES) completed a report entitled "Focus Feasibility Study for Conservation Chemical Company Site" in 1985 and, in 1987, prepared a report entitled "Addendum to the Focus Feasibility Study" (hereinafter the "FFS" and "FFS Addendum" respectively). Data collected in previous studies, including investigations conducted by EPA, by Ecology & Environment, Inc. (E & E) under contract to EPA, WES and a remedial investigation conducted by International Business Machines Corporation, AT & T Technologies, Inc., Armco, Inc., and FMC Corporation (the Original Generator Defendants) were used to describe the nature and extent of contamination. Contamination sources, contaminant migration paths, potential receptors, and potential risks posed by the contaminants are described in the FFS and the FFS Addendum.

"Among the potentially hazardous substances detected in the groundwater beneath and near the CCC site, 21 substances have been detected at concentration substantially in excess of the applicable criteria or standards for water quality. These include six metals, cyanide, four phenolic compounds, and ten volatile organic compounds (VOCs). In addition, aluminum and total phenolics (including compounds other than the four compounds specifically listed) have been detected at levels significantly high to cause concern for aquatic life. Trans-1,2-dichloroethylene has been detected at high concentrations (up to 47,100 ug/litre). These high concentrations may be of concern because of the chemical similarity between this substance and trichloroethylene, 1,1-dichloroethylene, and vinyl chloride.

"Finally, 2, 3, 7, 8-tetrachlorodibenzo-p-dioxin (2, 3, 7, 8-TCDD or dioxin) has been detected in several samples recovered from onsite borings with concentrations up to 29 parts per billion being reported. The high toxicity of this compound is well established. A level of 1 ppb has been recom-

mended as a guideline for permissible concentrations in soil at some sites where direct contact with dioxin contaminated soil is likely.

"A number of other inorganic and organic compounds have been detected in soil and groundwater at or near the CCC site. The 23 contaminants together with trans-1, 2–dichloroethylene and 2, 3, 7, 8–TCDD, are the primary contaminants of concern at this site.[21]

"An assessment of the risks presented by the CCC site is presented in the Endangerment Assessment, which is an attachment to the FFS. This assessment indicates that the greatest exposure pathway is associated with the wastes buried at the site which are in contact with the aquifer. These wastes serve as a source for continued release of contaminants into the aquifer where they may migrate into and under the Missouri River thereby threatening water supplies and inhibiting future aquifer development. The aquifer on the north side of the Missouri river is used as a residential drinking water source. Further development of or increased withdrawal from this aquifer may draw contaminants into municipal fields down stream of the site.

"The next greatest risk is presented by contaminated surface soils, which are a source of contamination that may be transported by precipitation runoff into surface water bodies or the groundwater. Contaminated soils also present hazards from direct contact and wind dispersion of particulates. Debris and machinery on the site surface also are potential contamination sources.

"At present, the CCC site contains miscellaneous surface structures, such as tanks and buildings, and the six basins that were used for the storage, treatment, and disposal of a variety of chemicals, liquid waste and sludges, which are presently covered."

Plaintiff's Exhibit 9, United States EPA, "Record of Decision Remedial Alternative Selection Conservation Chemical Company," at 1–8, 41 (September 30, 1987); Plaintiff's Exhibit 10, Cullinane and Crabtree, "Focus Feasibility Study For Conservation Chemical Company Site," at 1.1–3.13 (February, 1985). *See also, United States v. Conservation Chem. Co.*, 628 F.Supp. at 395–399.

A summary of the pertinent facts regarding the original remedial actions/alternatives [22] for the CCC Site and the selection process employed to choose the "slurry wall" remedy are stated in the Court's Memorandum Order of December 12, 1985, reported at 628 F.Supp. at 396–397. The Court adopts the facts in such Memorandum Order. *See also,* Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for Conservation Chemical Company Site," at 3.1–3.62 (1987); Plaintiff's Exhibit 9, United States EPA, "Record of Decision Remedial Alternative Selection," at 9–11 (1987); Plaintiff's Exhibit 10, Cullinane & Crabtree, "Focus Feasibility Study For Conservation Chemical Company," at 7.1–9.15 (1985).

With regard to the substitution of the hydraulic containment remedy, the following facts are excerpted from Plaintiffs' Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study For Conservation Chemical Site," (1987), with additional facts as noted:

"The planning and design of the selected remedy necessitated the conduct of addi-

---

**21.** See also, Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for the Conservation Chemical Company Site," at 2.11–2.15; *United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 183 (W.D.Mo.1985).

**22.** Remediation technologies considered in the Plaintiff's Exhibit 10, Cullinane and Crabtree, "Focus Feasibility Study for Conservation Chemical Company Site," (February 1985), included: increased monitoring; excavation; chemical solidification/stabilization; off-site disposal (RCRA or special landfill); on-site disposal (existing location or RCRA cell above floodplain); surface treatment; circumferential impermeable barrier; downgradient impermeable barrier; on-site (interior) withdrawal wells; downgradient withdrawal wells; hydraulic barrier; on-site subsurface drain; downgradient subsurface drain; diversion pumping; treatment of extracted groundwater; treatment of impacted water supplies; bottom sealing; incineration; and permeable treatment beds.

tional geotechnical investigations along and near the alignment of the proposed containment slurry wall. Some of these studies were conducted by IT Corporation on behalf of the [Original Generator Defendants]. The findings of these investigations are included in an IT Corporation letter dated October 6, 1986 (IT 1986a).

"As specified in the FFS, a detailed geotechnical investigation of the CCC site was conducted in preparation for designing the slurry wall system. Twelve borings extending to bedrock were made along the proposed alignment of the slurry wall. In addition, a seismic refraction survey was conducted to further refine the understanding of the bedrock surface (IT 1985(d)).

"An area of bedrock depression was located along the north portion of the proposed alignment. As a result, greater excavation difficulties are expected because of the greater depths. In addition, the defendants report that the exploration confirmed the presence of layers of sandy gravel and nested cobbles and boulders which will also increase the excavation difficulties.

"The remainder of the wall alignment was found by the defendants to exhibit typically alluvial and glacier deposition. Interbedded sands, sands and gravels, random cobbles and boulders, and lenses of course cobbles were found. The bedrock surface was found to be moderately to highly weathered and the profile ungulated in depths along the proposed wall alignment (IT 1986a).

"In responding to geological conditions identified in the additional investigations, IT Corp. (1986a, 1986c) developed a preliminary concept for construction of a composite soil bentonite-plastic concrete containment wall or for pre-grouting the soil along the alignment of the wall to increase its stability. The overall concept addresses four major issues related to slurry wall construction: bedrock keyway, excavation methodology, plastic concrete panel construction, and equipment loss. Within each of the areas of primary concern were several other technical issues.

"The bedrock keyway is a mechanism for preventing significant groundwater flow into the system at the slurry wall bedrock interface. The average permeability of the bedrock is approximately $1 \times 10^{-6}$. The slurry wall would be keyed to competent shale which will require a keyway depth ranging from 2 to 13 feet (the FFS assumed that a 3 ft. keyway would be adequate).

"The selected excavation methodology was revised to reflect the potential need for additional chiselling of the boulders and coarse cobble/gravel zones. An additional consideration is the need to control slurry loss during the construction due to the relatively coarse materials found in some areas. The additional quantity of coarse materials may also increase the cost of materials disposal since such coarse material may not be suitable for use in the slurry wall. Pre-grouting of the trench alignment was also suggested as an alternative technique to improve excavation operations. A revised concept for design of a construction working platform was also developed. This concept requires that the slurry wall elevation be maintained at least 5 ft. above the maximum ground-water elevation based on the 100–year flood. This recommendation would reduce the risk of trench collapse (by increasing hydrostatic pressure) during excavation.

"For that section of the wall in excess of 100 ft. in depth (approximately 600 ft. in length), IT Corp. developed a plastic concrete panel concept. The concrete panels would be used to overcome the problems associated with construction of the SB slurry wall in a deep area of very coarse material. Guide walls would be used in conjunction with the concrete panel construction to provide a stable top of trench.

"The additional geotechnical investigations indicated that the slurry wall concept, although still technically feasible, would be more difficult to construct than originally anticipated. These anticipated construction difficulties are reflected in the increase in the estimated cost of construction. Because of the relative uncertainties involved in construction of a slurry wall under the

conditions found at the CCC site, IT Corp. (1986a) developed three possible cost scenarios: best case, worst case, and most probable case. Based on the IT studies, the government developed a revised capital estimate of $5,500,000.

"The impact of the changed conditions on the capital cost of Alternative 4 was significant. (See Table 3.2, p. 3.11, "Addendum to Focus Feasibility Study"). The operation and maintenance costs were assumed to be the same as those presented in the FFS, i.e., $502,000 per year. The revised present worth of Alternative 4 based on the IT (1986a) report ranges between $15,523,000 and $26,638,000 with the most probable present worth of $19,503,000. The revised government estimate (present worth) is $17,086,000.

"The original FFS (Cullinane and Crabtree, 1985) evaluated four alternatives (Alternatives 5, 6, 7, and 8) that incorporated the concept of active hydrologic containment and recovery of the contaminant groundwater. These alternatives were oriented toward containment of the source of contamination and clean up of the contaminated offsite groundwater. Because of the anticipated high pumping rate and resulting high costs, these alternatives were discarded in favor of Alternative 4 (source containment with a slurry wall). As previously discussed, geological conditions at the site have resulted in an increase in the anticipated costs of Alternative 4. This anticipated cost increase makes the use of an active source of containment alternative potentially more attractive. Therefore, additional evaluation of such remedies has been conducted (Faust, 1987).

"Conceptual plans for five variations of remedial measures that depend on pumping were developed (Faust 1987). The plans are ... referred to here as Alternatives 10A, 10B, 10C, 10D, and 10E respectively. Alternatives 10A, 10B, and 10C involve hydraulic control of the original CCC site. Alternative 10D includes both hydraulic control near the site and a containment well. Alternative 10E provides for hydraulic containment of the entire area where

chemicals from the CCC site have migrated.

"*Containment by On Site Pumping (Alternative 10A).* The purpose of this site pumping remedy is to provide hydraulic containment of the site area. Containment would be achieved by pumping two or more wells located on site at sufficient rates to cause any groundwater beneath the site to flow to the wells. Because groundwater moves more rapidly in the deeper part of the aquifer, the wells should be screened to bedrock. Also, because the aquifer is highly permeable, pumping rates between 100 and 200 gpm per well would be required to achieve demonstrable containment. Water that is pumped from the aquifer must be treated to acceptable levels before it is discharged.

"Onsite pumping that achieves hydraulic containment should have an observable impact on groundwater levels and groundwater quality. First, a cone of depression in the groundwater surface would extend beyond the site itself. This cone of depression would be established quickly, within a day or so. Second, water quality outside the site should improve due to isolation of the source of chemicals in conjunction with dilution from mixing with cleaner groundwater. Because of the variability of chemical analyses and groundwater sampling, and the slower movement of groundwater, the improvement of offsite water quality is expected to be a slow process that is less easily verified.

"Two types of monitoring would be applicable to this plan, inward gradient monitoring and chemical monitoring of groundwater. Conceptual locations for wells and piezometers to be used in the monitoring program [have been determined].

"The conceptual piezometer network consists of six or more well pairs installed along the perimeter of the site. Inner piezometers are located 50 feet or less from the perimeter and outer piezometers are located about 100 to 200 feet outward from their corresponding inner piezometer. The piezometers should be screened and opened to the deeper part of the aquifer with each

piezometer pair open to similar materials and the same depth interval.

"The performance of the withdrawal well system in achieving hydraulic control would be verified by an analysis of a groundwater elevation data obtained in the piezometer network. Data will be averaged over a month. Because of accuracy limitations and monitoring water levels and because only six pairs of piezometers are employed, each pair must show a water level difference of 0.08 ft. on a monthly average basis. Outward gradients should occur no more than three days out of the month. In order to obtain monthly average data and daily data, it will be necessary to install highly accurate continuous water-level recorders in each piezometer. A system will have to be developed to monitor the accuracy of the piezometers over time."

Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for Conservation Chemical Company Site," at 2.11–2.12, 3.9–3.13 (1987). Regarding the selection process for the hydraulic containment remedy by the United States and OGDs, the following is taken from the "Record of Decision" (Plaintiff's Exhibit 9):

"The alternatives [23] selected for detailed comparative analysis were evaluated in the FFS Addendum according to the following criteria: Reliability; Implementability; Technical Effectiveness; Environmental Concerns; Safety; Regulatory Requirements; Public Acceptance; Cost; and Operation and Maintenance.

"*Reliability*

"Alternative 4: The major advantage of Alternative 4 [source isolation or 'slurry wall'] is the apparent structural containment of the waste materials within the circumferential barrier wall and the relative ease with which the effectiveness of this remedial action could be monitored. On the other hand, there are a number of uncertainties associated with the design and construction of such a wall at this site. These uncertainties are associated with the particular geology of the CCC site. However, because the interior withdrawal well system provides protection to the environment against leakage, these uncertainties primarily affect the cost of implementing this alternative rather than its reliability. (bracketed materials added).

"Alternative 10A: Alternative 10A [hydraulic containment or 'pump and treat'] relies on hydraulic, rather than structural, containment to prevent migration of contaminants from the site. Potential difficulties associated with the implementation of this alternative include reliance upon well-maintained water elevation instrumentation to monitor system performance, hydrogeologic uncertainties which may affect pumping rates and well locations, and the impact of the Missouri River on the withdrawal wells. Moreover, Alternative 10A is dependent on the long-term implementation of water treatment technologies to remove the contaminants from the groundwater pumped from beneath the site. On the other hand, it is anticipated that problems associated with this system can be resolved from an engineering standpoint by installing additional pumping and treatment capacity. (bracketed materials added).

23. The three alternatives selected were Alternative 11 (excavation and soil washing), Alternative 4 (circumferential slurry wall and interior leachate withdrawal system) and Alternative 10A (hydraulic containment). Excavation and Soil Washing (Alternative 11) was found to be the most technically difficult and most costly of the three alternatives. Although perhaps most preferable under Section 121 of CERCLA/SARA, Alternative 11 was rejected because of safety problems with waste excavation, because it would require significant additional studies to verify site specific feasibility, because of the potential for large short-term releases of contaminents and large volumes of RCRA sludges, and because it had never been implemented on the scale of the size of the CCC Site. *See*, Plaintiff's Exhibit 9, U.S. EPA, "Record of Decision," at 13–23 (1987); Plaintiff's Exhibit 11, Cullinane, "Addendum to Focus Feasibility Study for Conservation Chemical Company Site," at 4.1–4.10 (1987). Because Alternative 11 was considered, evaluated, and subsequently rejected by the United States and the Original Generator Defendants, that portion of the ROD relating to this alternative has been deleted. Although not fully discussed, the Court has carefully examined both the ROD and FFS Addendum with regard to Alternative 11 and agrees with the conclusion that Alternative 11 is not appropriate for implementation at the CCC Site.

"*Conclusion:* Both Alternative 4 and Alternative 10A could be implemented with a high degree of reliability.

"*Implementability*

"Alternative 4. While geologic conditions at the site may make Alternative 4 more difficult to construct than was believed in 1985, it is a technically feasible and constructable remedial alternative. Because the interior withdrawal well provides protection should leakage occur, the issue is one of cost rather than overall technical implementability.

"Alternative 10A. Construction of extraction wells and a groundwater treatment plant are within the state of current practice. The major difficulty with implementation of Alternative 10A is the development of an adequate monitoring program to ensure that the containment goals are achieved. Monitoring of groundwater elevations around the perimeter of the site to verify constant inward flow is the most appropriate manner for evaluating performance of such a system. Specification of precise pumping rates as a control measure is inappropriate because the geologic and hydrogeologic uncertainties at the site make calculation of precise pumping rates necessary to ensure adequate capture impossible. Construction and operation of treatment facilities for recovered groundwater as required for implementation of this alternative are within the current state of commercially available technology.

"*Conclusion:* Alternatives 4 and 10A are implementable based on existing technology. Although there are known technical problems with each, these problems can be resolved through application of well known engineering principles.

"*Technical Effectiveness*

"Alternative 4. Alternative 4 is technically feasible and, in combination with the interior withdrawal well, would result in physical containment of the waste materials on site. Wastes remaining on site would probably tend to concentrate somewhat; however, the interior withdrawal well system should protect the slurry wall from degradation by these chemicals. Alternative 4 could be modified to include a permeable cap that would allow infiltration to assist in the cleanup process. This modification would enhance the flushing process that would remove higher volume of contaminated groundwater from the site. There is no methodology available to estimate the length of time required for cleanup. The on-site cleanup would include the discharge of treated wastes containing acceptable levels of contaminants remaining in the groundwater after treatment to surface waters and the generation of solid wastes from the groundwater treatment processes. Contaminants that have already migrated beyond the containment barrier generally would not be captured by this alternative.

"Alternative 10A. Alternative 10A is technically feasible, and should result in containment of the waste materials on-site. Although designed primarily for containing the on-site contaminants, Alternative 10A would also clean up a portion of the off site contamination, including some contaminants not contained under Alternative 4. However, while the treatment technologies that will be employed provide high levels of treatment, they do not remove 100 percent of the contaminants. Thus, discharges to the Missouri River from the treatment plant would be greater than with Alternative 4. Alternative 10A includes a permeable cap that would allow infiltration to assist in the cleanup process. Theoretically, this containment would result in eventual cleanup of the on-site and some portions of the off-site contamination, although this cleanup process could take a substantial time period.[24]

---

**24.** Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for Conservation Chemical Company Site," at 4.5–4.6 (1987), states that "this cleanup process could take scores and even hundred of years." Expert witness, Dr. Charles R. Faust, testified that the remedy may have to operate "many 10s of years." (Transcript of November 23, 1987 Hearing, at 67). The Court is very concerned about the long-term funding for and long-term judicial involvement in a remedy which may last "hundreds of years." The EPA's conclusion that the "pump and treat" remedy is cost-effective, and expert testimony at the November 23, 1987 hear-

"Groundwater modeling was performed to estimate the parameters necessary to capture the groundwater which originates in or passes through the space beneath the CCC site such as withdrawal well locations and pumping rates. Also, groundwater treatment processes were analyzed to provide a conceptual design for a treatment system and to assess anticipated levels of discharge into surface waters.

"There is no methodology available to estimate the length of time required for cleanup. One could speculate that Alternative 10A, which allows continued migration of the groundwater through the site, might result in cleanup at a faster rate than Alternative 4, however there is no present methodology to predict how fast either alternative would remediate the site. This cleanup would include the discharge of acceptable levels of contaminants remaining in the groundwater after treatment to surface waters and the need to dispose of solid wastes resulting from the groundwater treatment processes.

"*Conclusion:* Technically effective remedial actions based on the concepts contained in Alternatives 4 and 10A, could be constructed.

"*Environmental Concerns*

"Alternative 4. Whereas technical effectiveness concerns the primary goal of contaminants containment, environmental concerns relate to the secondary impacts of a remedial alternative. Alternative 4, although offering positive containment of the on-site contaminants, results in several environmental concerns, including:

Extraction of a large quantity of contaminated material during construction of the containment barrier, which would probably require disposal in accordance with RCRA requirements.

Discharge of treated groundwater.

Generation of sludges in the groundwater treatment processes that may require disposal in accordance with RCRA requirements.

"Alternative 10A. Alternative 10A also poses environmental concerns similar to those associated with Alternative 4. However, under Alternative 10A, since the only construction into contaminated materials would be the on-site extractions wells, there would not be large amounts of contaminated materials requiring disposal. This factor is offset by the greater discharges of extracted groundwater into surface waters and greater volumes of sludges generated by the water treatment processes.

"*Conclusion:* Each of the alternatives raises a number of environmental concerns. Efforts should be made during the remedial design to minimize environmental consequences of the remedial action selected. "*Safety*

"Alternative 4. The construction operations associated with Alternative 4 pose the potential for contact with large quantities of contaminated materials. This potential contact presents the primary safety concern for this Alternative. Proper planning and design can minimize these concerns, but not eliminate them.

"Alternative 10A. Alternative 10A involves some potential contact with contaminated materials during construction of the on-site extraction wells and, to a lesser degree, the monitoring wells. However, this potential for contact is much less for Alternative 10A than for the other alternatives. The handling and disposal of treatment chemicals, and sludges, would involve potential exposure to contaminants. The potential exposures could be minimized through proper planning and design. Also, potential hazards associated with the sulfide precipitation process would be minimized by proper planning and design.

"*Conclusion:* Alternative 4 and 10A can be constructed with an adequate margin of safety for both on- and off-site personnel. "*Regulatory Requirements*

"Implementation of each of the alternatives involves consideration of a number of regulatory requirements falling within the

ing, that hydraulic containment remedy is cost-effective even in light of an operation lasting

perhaps "hundreds of years" was not challenged or controverted.

jurisdiction of a variety of regulatory agencies.

*"Public Acceptance*

"Alternative 4. Alternative 4 would result in the positive containment of the source of on-site contamination and address the major environmental and health problems created by the CCC site. Because existing off-site contamination including any potential migration of non-aqeous-phase liquids (NAPL), is not specifically addressed by this alternative, the public may not view this alternative alone as an acceptable remedy for the site.

"Alternative 10A. Alternative 10A would result in the containment and some treatment of the primary source of on-site contamination and the cleanup of some contamination that has already migrated off-site. There may be some concern by the public regarding off-site contamination, but that level of concern should be less than for Alternative 4.

*"Conclusion:* No major public acceptance problems have been identified or are expected with the alternatives. Thus, the alternatives are generally equivalent based on anticipated public acceptance.

*"Cost*

"The present worth was calculated over a thirty-year time period using a discount rate of 10 percent. These cost estimates are based on the best engineering judgment using currently available information. There are a number of uncertainties associated with each of these alternatives and are discussed in more detail below. The discount rate of 10 percent was used, based on United States Office of Management and Budget (OMB) Circular No. A–94 (revised) dated March 27, 1972.

"Alternative 4. The present worth estimate for this alternative is $17.09 million. The cost of Alternative 4 cannot be calculated at this time. Primary uncertainties which prevent such a calculation include the cost of constructing the containment barrier and the pumping rate which would be required to maintain an inward hydraulic gradient, and the requisite cost of treating the extracted groundwater prior to discharge. These uncertainties could substan-

tially impact the actual cost of this alternative.

"Alternative 10A. The present worth estimate for this alternative is $21.4 million. The cost of Alternative 10A cannot be calculated at this time. Primary uncertainties which prevent such a calculation include the required pumping rate to maintain an inward hydraulic gradient and the requisite costs of treating the extracted groundwater. These uncertainties could substantially impact the cost of implementing this alternative.

*"Conclusion:* The estimated costs for the alternatives are similar. While there are a number of uncertainties for each alternative, in relative terms, the uncertainties are probably the least for Alternative 10A.

*"Operation and Maintenance*

"This section addresses the skill levels and potential time periods required for operation and maintenance activities, rather than the cost of operation and maintenance, which are addressed above.

"Alternative 4. Operation and maintenance activities associated with Alternative 4 involve maintenance of the surface cap and containment wall, and operation and maintenance of the groundwater treatment system and groundwater monitoring system. With the possible exception of maintenance of the barrier wall involving repair of a breach in the wall, each of these activities require skill levels which are generally available. Repairing a breach in the barrier wall would be a specialized process. Operation and maintenance for this alternative would be required until the wastes no longer need to be contained, *i.e.* all applicable or relevant and appropriate requirements ('ARARs') have been met.

"Alternative 10A. Operation and maintenance activities associated with Alternative 10A involve maintenance of the surface cap and operation and maintenance of the groundwater monitoring system. Surface cap maintenance would require similar skill levels to that required for maintenance of the surface cap for Alternative 4. The operation and maintenance require-

ments for the groundwater monitoring system similarly would be much greater than that required for Alternative 4 because the water level differentials being measured are much smaller and would therefore require much more sensitive water level instrumentation than required for Alternative 4. Since there would not be a barrier wall to maintain, there would not be a potential need to repair a breach in the wall. The overall skill levels required for Alternative 10A are generally available. Operation and maintenance for this alternative would be necessary until all ARARs have been met. Since this is an active pumping system, the time period to meet ARARs might be shorter than for Alternative 4.

"*Conclusion:* Each of the alternatives considered would require persons with some level of specialized skills for operation and maintenance activities. In relative terms, Alternative 4 and Alternative 10A would require approximately the same level of skills.

"Alternative 4 probably would require the longest period for operation and maintenance. Alternative 10A might require a somewhat shorter operation and maintenance period than Alternative 4.

"Based upon the evaluation of remedial alternatives described and consideration of the applicable or relevant and appropriate legal requirements, an active pumping containment system, which was evaluated as Alternative 10A, is selected as the remedial alternative for this site. *This alternative is consistent with the general requirements of Section 121(b) of CERCLA that a remedial action shall be selected which is 'protective of human health and the environment, that is cost effective, and that utilizes permanent solutions and alternative treatment technologies or resources recovery technologies to the maximum extent practicable.'*

"A remedy employing an active pumping system would be protective of human health and the environment. Contaminants present at the site will be contained at the site, thereby eliminating further uncontrolled releases into the environment. Contaminants present in the groundwater extracted to achieve hydraulic containment will be properly treated prior to discharge. Potential environmental impacts of wastes generated during construction of the remedial action are also less than those presented by the other alternatives considered. Finally, because an active pumping system relies upon the use of currently available technology, which can be constructed in the shortest time frame, this alternative would provide expeditious implementation of the remedial action with substantial certainty as to its effectiveness in protecting public health and the environment.

"*Furthermore, an active pumping system containment system would provide a cost effective remedy for the site.* Given the uncertainties associated with implementation of any remedy at the CCC site, Alternative 10A may prove to be the least costly remedy that would meet the environmental goals and requirements of CERCLA. Treatment of hazardous substances to reduce their volume, toxicity and mobility by treating the extracted groundwater is the principal element of Alternative [10]A. Alternative 11 also involves treatment which reduces the volume, toxicity and mobility of the hazardous substance present at the site. However, the uncertainties of its technical feasibility at this site raise substantial question as to its practicability. Extensive research would be necessary prior to its implementation to resolve this question. For these reasons, Alternative 10A offers treatment to the maximum extent practicable. (emphasis added).

"The selected remedy would incorporate the following features:

"a. *Surface Cleanup/Surface Preparation*

—The on-site building will be demolished and its basement filled to grade.

—The septic system will be demolished or grouted. All other depressions will be properly graded in such a manner that the cap integrity will be maintained.

—All existing tanks and solid debris remaining on site from CCC's past operation [of] the facility either will be cut

into pieces for incorporation under the cap or decontamination and disposed of off-site.

—The existing surface of the CCC Site will be regraded utilizing on-site soils to the fullest extent practicable to fill in localized depressions prior to installation of the cap.

## "b. Protective Surface Cap

"A two-layer cap for the CCC Site will be constructed as follows:

—The lower layer of the cap will be constructed over the existing fill and will consist of at least 19 inches of geotechnically stable loess, locally available.

—The upper layer (vegetated top cover) will be at least 6 inches of top soil, able to support persistent vegetation, and will be planted. The cap will have a final slope not less than 3% and will have a surface drainage system capable of conducting runoff across the cap without erosion rills.

—Provision will also be made for paved chutes, flumes or rigid downpipes to transport water down the steep sided embankments. These embankments will have a slope not greater than 5:1 (horizontal:vertical).

—The embankments of the cap and site will be protected from floods with a layer of riprap.

—At the end of the remedial action, a permanent cap to meet the then-existing regulatory requirements will be provided.

## "c. Withdrawal Well System

"An on-site groundwater withdrawal well system designed to capture all of the groundwater emanating in or passing through the site will be installed. This system will be designed so that its performance can be verified by determining differences in water levels at paired piezometers surrounding the site.

"If the withdrawal wells installed are not capable of meeting the performance standards, then additional wells will be installed to provide sufficient pumping and treatment capacity as needed to achieve the performance requirements as soon as practicable.

## "d. Ground Water Treatment System

—A system for treating water extracted by the withdrawal well system will be constructed and operated in such a way that the effluent from the facility is discharged at a level that will meet any effluent limits established under the Missouri Clean Water Law or the Federal Water Pollution Control Act. The treatment system will include, at a minimum, such treatment processes as metals precipitation (utilizing both hydroxide and sulfide precipitation), filtration, biological treatment, and carbon absorption. Treatment processes that provide an equivalent level of performance may be substituted for those listed above. The metals precipitation unit will be designed and operated in a manner with seeks to attain the following levels:

| Metal | Design Values, ug/1 |
|-------|---------------------|
| Al | 100 |
| As | 50 |
| Cd | 2 |
| Cr | 20 |
| Fe | 20 |
| Pb | 5 |
| Ni | 150 |
| Zn | 30 |

Additional studies will be performed of the contaminated groundwater to determine whether alkaline chlorination is capable of reducing the level of cyanides at the site.

—All State of Missouri requirements which are applicable or relevant and appropriate, including applicable Missouri effluent limits, will be met.

—All sludges generated by groundwater extraction and treatment facility operations shall be managed in accordance with all applicable regulations.

—Discharges of contaminants to the air by the groundwater extraction and treatment facility construction, operation, and maintenance will be in accordance with the Clean Air Act and all applicable regulations.

## "e. Off-site Groundwater Quality Monitoring System

—A number of monitoring wells (approximately 12) will be installed to monitor water quality and groundwater elevations. The location of these wells will be determined in the design phase.

—The water quality and groundwater elevation surveys will be conducted quarterly for the first three years with analysis for priority pollutants and other selected water quality parameters.

—After the first three years the groundwater quality and groundwater elevations will be monitored according to the following schedule:

Years 4–5   Quarterly
Years 6–20  Annual
Years 21–30 Biennial (every two years)
Year 30     Complete reevaluation of water
            monitoring program; determination
            of need for future.

These schedules may be adjusted depending on the data developed during the monitoring program. All analyses of samples will be performed using EPA approved protocols, handling, reporting and chain of custody procedures, all of which will be described in detail in a groundwater monitoring plan, to be developed during the planning or design phase of the remedial program.

"f. *Operation and Maintenance Program*

—An Operation and Maintenance (O & M) Plan will be developed and implemented for the CCC Site which provides a schedule and description of maintenance activities.

—The O & M Plan will include provisions for the cap, perimeter fence, monitoring wells, water level recorders, wastewater treatment system, sewer lines and any other structures constructed or installed pursuant to this remedial program."

Plaintiff's Exhibit 9, United States EPA, "Record of Decision Remedial Alternative Selection," at 13–28 (September 30, 1987); *see also*, Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study

for Conservation Chemical Company Site," at 4.1–4.10 (1987), for another comparative evaluation of Alternatives 4, 10A and 11.

III. *Conclusions of Law.*

In the Memorandum Order approving the Preliminary Agreement and the "slurry wall" remedial action therein submitted, *United States v. Conservation Chem. Co.*, 628 F.Supp. 391 (W.D.Mo.1985), the Court adopted the process and standards used by the court in *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334 (S.D.Ind.1982), to review a proposed consent decree.[25] *United States v. Conservation Chem. Co.*, 628 F.Supp at 400. Thus, in determining whether the Consent Decree proposed here should be approved, the Court must: (a) inquire whether the decree is consistent both with the Constitution and with the mandate of Congress; (b) assure itself that the terms of the decree are fair and adequate; and (c) inquire whether the settlement is a reasonable one. That is, if the Consent Decree submitted meets the above tests and is therefore legal, fair, and reasonable it should be approved.

(a) *Legality.* None of the parties nor any nonparty has raised any objection to the Consent Decree on the basis that it violates any law or is inconsistent with any Congressional mandate, nor has anyone suggested that the Court's approval should be withheld because the Consent Decree is in any way illegal. Similarly, the Court is not aware of any claim that the remedial action (hydraulic containment) in the Consent Decree is inconsistent with CERCLA/SARA. On the contrary, it appears from the unrebutted and uncontroverted evidence adduced at the November 23, 1987 hearing that the hydraulic containment remedy set forth in the Consent Decree is fully consistent with Section 121 of CERCLA/SARA and is a preferred remedy employing technologies which permanently and significantly reduce the mobility, toxic-

---

**25.** In other contexts, Courts have utilized slightly different standards to review proposed Consent Decrees. *See, e.g., United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Metropolitan Housing Dev. Corp. v.*

*Village of Arlington Heights, Ill.*, 616 F.2d 1006 (7th Cir.1980) ("fair, adequate, reasonable, and appropriate under the circumstances); *Dawson v. Pastrick*, 600 F.2d 70 (7th Cir.1979) ("equitable and in public interest").

ity or volume of wastes. On this basis alone, the hydraulic containment remedy as proposed in the Consent Decree is more desirable than the source isolation remedy contained in the Preliminary Agreement. Furthermore, the hydraulic containment remedy is both cost-effective and technically feasible according to the uncontroverted evidence received to date.

According to the United States EPA, the remedy now proposed is consistent with the National Contingency Plan (Testimony of Robert Morby, Transcript of November 23, 1987 hearing, at 197), and "is consistent with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), and National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. Part 300." (Plaintiff's Exhibit 9, "Record of Decision Remedial Alternative Selection," Declaration of Morris Kay, Regional Administrator of United States EPA, p. 2).[26]

Furthermore, the provisions of Section 122 of CERCLA, 42 U.S.C. § 9622, as amended by SARA, specifically authorize the President, in his discretion, to enter into an agreement with any person (including the site owner or operator or other potentially responsible party) to perform any response action if the President determines that such response action will be done properly by that person. Section 122(d)(3) further provides that whenever the President enters into an agreement with any potentially responsible party with respect to an action under Section 104(b) the President shall enter into a decree setting forth the obligations of such party. No evidence was presented at the November 23, 1987 hearing that the OGDs will not or cannot properly perform the contemplated remedy, and the Court is not aware that any person is making any such claim.

The Court therefore believes that CERCLA/SARA clearly expresses an intent to encourage settlements and that the proposed Consent Decree is consistent with and furthers the settlement policies of CERCLA/SARA, and is not violative of any law. Similarly, the Court concludes that the Consent Decree was properly lodged with the Court by the United States in accordance with 42 U.S.C. § 9622 and 28 C.F.R. § 50.7, that the period for public participation has been provided and no comments from the general public have been received, and that more than thirty (30) days have elapsed since the filing of the Consent Decree with the Court. It thus appears, and the Court finds, that the par-

26. On December 24, 1987, Midland–Ross Corporation filed a pleading styled "Midland–Ross Corporation's Suggestions Regarding the November 23, 1987 Hearing." Midland-Ross argues that the evidence presented at the November 23, 1987 hearing was insufficient to establish that the proposed remedial action is consistent with the National Contingency Plan; and, in fact, Midland–Ross contends that the evidence established that part of the proposed remedial action is inconsistent with the NCP's cost-effectiveness requirements because it includes an unnecessary second metals removal unit. Despite the remedy's alleged inconsistency with the NCP and the purported lack of evidence to support a finding of consistency with the NCP, Midland–Ross suggests that the Court need not decline to approve the proposed Consent Decree but only "that the Court acknowledge that the OGDs agreed to implement actions which result in them incurring unnecessary costs and decline to assist the OGDs in their efforts to recover such unnecessary costs from the third-party defendants." (Suggestions, at 4–5).

Assuming that Midland–Ross' "Suggestions" were timely made, its argument is without foundation as it plainly ignores the uncontroverted testimony of Robert Morby to the effect that the remedy proposed is not only not inconsistent with the NCP, it is consistent with the NCP, (Transcript of November 23, 1987 hearing, at 197–201); as well as Plaintiff's Exhibits 9 and 11, both of which contain ample evidence of the proposed remedy's consistency with the NCP. Dr. Hustad's *personal* opinion regarding the necessity of a sulfide precipitation treatment unit to meet effluent standards, does not make the proposed remedy with sulfide precipitation treatment any less consistent with the NCP. At the November 23, 1987 hearing, Dr. Hustad simply testified that in his personal opinion sulfide precipitation was not necessary to meet proposed draft effluent limits suggested for a specific discharge treatment program. (Transcript of November 23, 1987 hearing, at 189). Dr. Hustad did not say that a permit under the Clean Water Act could or might be issued at some future date without a water treatment system utilizing sulfide precipitation technology. Midland–Ross' "Suggestions" are without merit and thus rejected by the Court.

ties to the Consent Decree have complied with the applicable provisions of CERCLA, as amended.

(b) *Fairness.* The Court assumes that the United States and Original Generator Defendants believe that the Consent Decree is fair as they are signatories to it and have requested its approval by the Court. Similarly, the absence of objection at the November 23, 1987 hearing or active participation in such hearing on the issue of fairness by any of the third-party defendants or by any nonparty seemingly indicates agreement that the Consent Decree is not unfair.[27]

Despite the lack of specific objection at the November 23, 1987 hearing on the issue of fairness, the Court believes that the Consent Decree as now proposed is flawed because it does not provide for the apportionment of response costs when and if the $15 million "cap" is exceeded.

The testimony presented at the July 8–9, 1987 hearing before the Special Master and evidence introduced at the November 23, 1987 hearing, indicate that the $15 million "cap" will be reached and substantially exceeded in perhaps as little as seven (7) years. (See, Defendants' Exhibit 13; Plaintiff's Exhibits 9 and 11). Once the response cost "cap" is exceeded, the OGDs will almost certainly attempt to obtain contribution from the Third–Party Generator Defendants for the overage. The failure of the Consent Decree to address adequately the apportionment of future response costs in excess of the "cap," and the effect of such omission have been raised by both the Special Master and the Court and discussed with the United States and the OGDs on numerous occasions. This Court

has repeatedly stated its reluctance to approve a consent decree which fails to include a satisfactory provision for apportionment[28] of future response costs. In fact, the Court in its November 30, 1987 Order, stated that approval of the Consent Decree would not even be considered until apportionment of response costs was adequately addressed in the Consent Decree. To date, no agreement has been reached, and on January 29, 1988 the OGDs and Third–Party Defendant Generators jointly reported a failure to reach a complete or even partial agreement to resolve this lingering concern.

Because of the failure of the OGDs and Third–Party Defendant Generators to reach an agreement as to the method to apportion or the actual apportionment of response costs above the $15 million "cap," the Court is convinced that approval of the Consent Decree must be followed by a hearing and determination of apportionment of future response costs between all the parties. With apportionment of future response costs, the Court believes the Consent Decree will be fair to all parties to the litigation.

(c) *Reasonableness.* In analyzing the reasonableness of the proposed Consent Decree, the Court must consider five (5) factors: (i) the nature and extent of the potential hazards at the CCC Site; (ii) the availability and likelihood of alternatives to the Consent Decree which would result in a cleanup of the CCC Site; (iii) the adequacy of the technical proposal of the work to be undertaken in connection with the cleanup of the CCC Site; (iv) the extent to which the Consent Decree furthers the goals of CERCLA/SARA; and (v) the extent to

---

**27.** *But see,* Transcript of Proceedings before the Special Master, July 9, 1987, Vol. II, at 355–360, where Third–Party Generator Defendant Midland–Ross argued that the proposed Consent Decree was neither fair nor reasonable because the provision in the Consent Decree by which the United States will provide the CCC Defendants with a covenant not to sue (unless the remedial action exceeds $20,000,000) may result in "shortfall" between the CCC Defendants' eventual apportioned liability and various payments made on behalf of the CCC Defendants. Midland–Ross similarly recognized, "Eventually there are some apportionment decisions that are

going to have to be made here, unless the Original Generator Defendants are able to hold their costs under $15 million...." (Transcript of Proceedings before the Special Master, July 9, 1987, Vol. II, at 357).

**28.** At least one federal court has reportedly declined to approve a hazardous waste cleanup settlement because of a failure to protect the rights of third-party defendants. *New York v. Shore Realty Corp.,* —— F.Supp. ——, 18 Env't Rep. (BNA) 1358 (E.D.N.Y. September 9, 1987).

which the approval of the Consent Decree would be in the public's interest.[29]

"(i) *Nature and extent of the potential hazards at the CCC Site.* The greatest risk presented by the CCC Site is associated with hazardous wastes buried at the Site which are in contact with the aquifer. These wastes serve as a source for continued release of contaminants into the aquifer where they migrate into and under the Missouri River, thereby threatening water supplies and inhibiting future aquifer development. The next greatest risk is presented by contaminated surface soils which may be transported by precipitation runoff, direct contact, and wind dispersion. (Plaintiff's Exhibit 9, United States EPA, 'Record of Decision Remedial Alternative Selection,' at 8 (1987); Plaintiff's Exhibit 10, 'Focus Feasibility Study for Conservation Chemical Company Site,' at 3.1–3.13 (1985).

"(ii) *The availability and likelihood of alternatives to the Consent Decree which would result in a cleanup of the CCC Site.* The most obvious alternative to the Consent Decree which would result in a cleanup of the CCC Site is by utilizing Superfund monies, but such would or could result in a delay in implementation of the remedy with all the concomitant dangers to public health and welfare.

"Thus, all relevant factors being considered, the Court believes that the general public policy and the specific policy behind CERCLA/SARA to encourage settlement requires that the Court give a strong preference to private funding of hazardous waste cleanups and the use of consent decrees to accomplish this aim. Thus, although at least one cleanup alternative is available, it is neither more efficient nor economical than cleanup via a consent decree.

"(iii) *The adequacy of the technical proposal of the work to be undertaken in connection with the cleanup of the CCC Site.* The uncontroverted testimony[30] and documentary evidence[31] presented at the hearing before the Special Master in July and again at the Court hearing on November 23, 1987, indicate that the hydraulic containment remedy is technologically feasible, effective, and could be constructed using existing technical practices. Although there are some uncertainties associated with the implementation of the hydraulic containment remedy including difficulties of monitoring[32] such a system, hydrogeologic uncertainties and the effect of the Missouri River on the withdrawal wells, and dependency upon the long term implementation of complex water treatment technologies to remove contaminants, it appears that at least from a conceptual standpoint most of the problems could be solved by the installation of more wells and by adding treatment capacity. *See,* Transcript of November 23, 1987 hearing, at 41–42, 59; Plaintiff's Exhibit 11, Cullinane, 'Addendum to the Focus Feasibility Study for Conservation Chemical Company Site,' at 4.4 (1987).

"The expert testimony and exhibits introduced at the November 23, 1987 hearing further demonstrated that the 'pump and treat' remedy would be adequate to stop or substantially eliminate hazardous waste leakage into the Missouri River from the

---

29. *See, United States v. Conservation Chem. Co.,* 628 F.Supp. 391, 402 (W.D.Mo.1985) (citing, *United States v. Seymour Recycling Corp.,* 554 F.Supp. 1334, 1339 (S.D.Ind.1982)).

30. Steven P. Larson (Transcript of November 23, 1987 hearing, at 31–41); Dr. Charles R. Faust (Transcript of November 23, 1987 hearing, at 53–60); Dwight Robinson (Transcript of November 23, 1987 hearing, at 97–98); Murdock J. Cullinane (Transcript of November 23, 1987 hearing, at 140–157); Dr. Paul A. Hustad (Transcript of November 23, 1987 hearing, at 165);

and Robert L. Morby (Transcript of November 23, 1987 hearing, at 198–200).

31. Plaintiff's Exhibit 9, United States EPA, "Record of Decision Remedial Alternative Section," at 16–17 (1987); Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for the Conservation Chemical Company Site," at 4.3–4.6 (1987).

32. *See,* Plaintiff's Exhibit 11, Cullinane, "Addendum to the Focus Feasibility Study for the Conservation Chemical Company Site," at 4.4 (1987).

CCC Site [33] thereby protecting the public and environment against the primary risk associated with the CCC Site.[34] Importantly, expert opinion testimony revealed that the hydraulic containment remedy was a 'better' remedy than the 'slurry wall' remedy because it would control a larger area, because it is more active, because it employs standard technology, and finally because it is easily modified if unanticipated conditions are encountered.[35] The expert testimony also established that the hydraulic containment remedy uses accepted technology which has been selected for use at other hazardous waste sites.[36] Plaintiff's Exhibit 11, 'Addendum to the Focus Feasibility Study' confirmed that the hydraulic containment remedy (Alternative 10A) can be constructed (p. 4.3), that it will be technically effective (p. 4.5) and would result in a cleanup of both on-site and off-site contamination (pp. 4.5–4.6), and that it possesses minimal safety issues for on-site and off-site personnel (p. 4.7).

"Such evidence demonstrates that the proposed hydraulic containment remedy is an appropriate and proper remedy to cleanup the CCC Site. It is preferred to other acceptable remedies including the 'slurry wall' remedy, because it can control a larger area, because it employs technology which will result in a permanent and significant reduction of the mobility, toxicity and volume of hazardous waste at the CCC Site, and because it minimizes the actual or potential endangerment posed to human health by ingesting contaminated groundwater or to aquatic life by movement of contaminated groundwater into the Missouri River. The hydraulic containment remedy is also favored because it can be modified by adding wells and/or treatment facilities should the circumstances warrant it.

"No evidence of any kind established that the proposed hydraulic containment remedy would not be technically effective in cleaning up the CCC Site or that it was not feasible from an engineering or technological standpoint. Admittedly, the remedy may be more complex than the 'slurry wall' remedy and perhaps it may require greater skill to operate and maintain than other remedies investigated, but on the basis of the uncontroverted expert testimony the Court concludes that the hydraulic containment remedy will provide a more thorough and permanent remedy than the 'slurry wall' remedy originally proposed and approved.

"Similarly, although some of the evidence indicates that the hydraulic containment remedy could conceivably be more costly than the 'slurry wall' remedy, the relative costs can not be evaluated precisely at this time due to uncertainties as to the construction of the slurry wall and the development of the groundwater treatment system. Given the imprecision of cost estimates for the alternative remedies and the uncontroverted expert testimony that the hydraulic containment remedy *is* cost effective, the Court concludes that the hydraulic containment remedy is proper and should be substituted for the source isolation or 'slurry wall' remedy previously approved.

"On the basis of the uncontradicted evidence received at the November 23, 1987 hearing, the Court therefore concludes that the hydraulic containment remedy is adequate from a technical standpoint to accomplish a cost-effective, permanent cleanup of the CCC Site. The adequacy of the remedy

---

33. *See,* Transcript of November 23, 1987 hearing, at 32–33 (the "pump and treat" remedy is and will be adequate to stop or substantially eliminate any hazardous waste leakage into the Missouri River from the CCC Site).

34. *See,* Plaintiff's Exhibit 9, United States EPA, "Record of Decision Remedial Alternative Selection," at 8 (1987); Plaintiff's Exhibit 11, Cullinane, "Addendum to Focus Feasibility Study for Conservation Chemical Company Site," at 2.2 (1987).

35. *See,* Transcript of November 23, 1987 hearing, at 58–59 (Dr. Faust recommended that EPA change its position from a "slurry wall" remedy to a "pump and treat" remedy because it was a better remedy).

36. *See,* Transcript of November 23, 1987 hearing, at 35 (groundwater pumping and treating is a recognized technology for dealing with the type of pollution problem at this type of site); at 46 (review of RODs included 22 utilizing groundwater pumping and treatment).

is, however, diminished or perhaps negated by incomplete Site access easements. In order for the remedy to be performed efficiently and properly, complete access to the CCC Site over, across and under the property owned by KCP & L and/or Mobay is required. *See*, Consent Decree, Section IX, at 26. The easements provided to date do not, in the Court's opinion, ensure the required and necessary access to the CCC Site.[37]

"For example, both the KCP & L and Mobay Easements are 'non-exclusive.' These provisions could result in KCP & L and/or Mobay granting additional or future easements and licenses which might substantially interfere with and unduly restrict access by the OGDs and their workers to the CCC Site. At a minimum, the OGDs should insist and KCP & L and Mobay should agree that no additional easements or licenses will be granted which would in any way interfere with or restrict the OGDs' access to the CCC Site or their entry upon the easement property. The same is true with regard to the 'non-exclusive' use of the 'Roadway.' The easements should limit traffic on the Roadway or use of the Roadway so as to avoid any possible interruption in the performance of the remedy. (The KCP & L Easement should contain specific language regarding use of the Levy Road, and Paragraph 9 of the Mobay Easement should be expanded specifically to include both of these points).

"KCP & L and Mobay must be willing to defend the easements granted to the OGDs and their titles to the properties and provide a title report/survey and title insurance. The KCP & L and Mobay Easements are of little value if the grantors' titles are in question and/or the grantors will not warrant titles to the easement properties.

"The Easements should provide that any insurance maintained include the United States as an additional insured and that any insurance is applicable to the United States in the event of default by the OGDs.

"Both proposed easements are to be granted to the 'Front Street Trust,' rather than the OGDs. The OGDs admit, however, that no such trust has been formed, and the OGDs have not submitted any trust documents to either the Court or the United States for review. Without an opportunity to review the trust documents or other assurance of the trust's perpetual existence, the Court cannot determine whether the Easements should be made with the 'Front Street Trust' and OGDs or whether the trust entity is satisfactory alone. All trust documents relating to the formation of the 'Front Street Trust' must be furnished to the United States and the Court for review and approval.

"Finally, the Court wants assurance from the United States that both Easements contain all required and necessary provisions for complete access to the CCC Site from KCP & L and/or Mobay's property to perform fully the proposed remedy. For example, neither Easement provides for access to the CCC Site landward of the flood control levee other than by access road.[38] If the United States thinks this omission is significant, it should so indicate plainly and request the OGDs to secure all required easements for all necessary routes to and from the CCC Site.

"(iv) *The extent to which the Consent Decree furthers the goals of CERCLA/SARA.* The Court has no doubt that the hydraulic containment remedy proposed in the Consent Decree is consistent with and furthers the goals of CERCLA/SARA, and certainly no evidence has been presented to date to suggest otherwise. On the basis of expert testimony received at the November 23, 1987 hearing, the hydraulic containment remedy appears to be a cost effective remedy which will protect human health and the environment; and, when implemented, will reduce the volume, toxicity and mobility of the hazard-

---

37. The Court does not believe it should write the easements for the parties and therefore will not attempt to do so. The items listed here are recommendations of the changes and additions which the Court believes are necessary to make both easements acceptable and workable.

38. *See*, "Motion for Entry of Judgment" filed by the United States on February 1, 1988, at 6.

ous substances, pollutants and contaminants found at the CCC Site.

"The Court finds that the remedy furthers the goals of CERCLA/SARA, and (except as noted above) the Consent Decree is likewise consistent with the aims and goals of CERCLA/SARA.

"(v) *The extent to which the approval of the Consent Decree would be in the public's interest.* As with the previous factor, the Court believes that there is no question that approval of an adequate consent decree and the implementation of the hydraulic containment remedy would be in the public's interest. The cleanup of the CCC Site in a timely, thorough and cost effective manner is in the best interest of the public and the environment. A proper consent decree providing a realistic solution which results in a permanent cleanup of the CCC Site would also contribute to the efficient utilization of scarce federal judicial resources. Public interest also strongly favors settlement of disputes and the termination of time-consuming and expensive litigation.

"It is clear therefore that approval of the remedy proposed in the Consent Decree and the resolution of the present litigation by consent decree are in the public's best interest."

### IV. *Conclusion and Summary.*

In summary, the Court finds that the hydraulic containment proposal for remediation of the CCC site is legally and technically appropriate and should be substituted for the source isolation remedy approved by the December 12, 1985 Order. To the extent that all issues in this litigation relating to remedial action were bifurcated and scheduled for trial at the November 23, 1987 hearing pursuant to Rule 42, Federal Rules of Civil Procedure, the Court enters partial judgment approving the remedy and finding same to be consistent with the National Contingency Plan. The Court hereby sets for a hearing before the Special Master on the 11th of April, 1988 the question of whether plaintiff, the Original Generator Defendants, and CCC defendants have incurred or will incurr costs for which they may seek contributions from the third-party defendants pursuant to 42 U.S.C. § 9607 or 42 U.S.C. § 6973. The Court further concludes that the Consent Decree should be and is hereby approved as presently constituted with respect to the remedial action proposed, and the Consent Decree itself is hereby conditionally approved subject, however, to the following:

(1) Submission to the Special Master and the Court within thirty (30) days from the date hereof of fully executed and duly acknowledged easements from both KCP & L and Mobay for access to the CCC Site in forms fully approved by the United States and incorporating the Court's suggestions heretofore listed, together with fully signed stipulations authorizing the recording of such easements upon the Court's final approval of the Consent Decree; and

(2) Submission to the Special Master and the Court within thirty (30) days from the date hereof of the trust documents for the "Front Street Trust".

When both of the listed conditions are fully satisfied and the Court approves the easements and trust documents upon recommendation from the Special Master, the Court will render and enter a final Order fully approving the Consent Decree.

Should the Original Generator Defendants fail to submit within thirty (30) days both easements (in recordable form) providing for full and complete access to the CCC Site during the entire life of the remedy together with all the documents relating to the creation and duration of the "Front Street Trust," and/or should the United States refuse to approve the easements and/or trust documents, and/or should the Original Generator Defendants fail to submit fully executed stipulations authorizing the recording of both easements, the proposed Consent Decree will *not* be approved or entered by the Court. In the event that the Consent Decree is not approved, the Court shall, by subsequent Order, set the Complaint and Third–Party Complaint for trial at the earliest available date.

In the Court's Order of November 30, 1987, the parties were given three options

with respect to apportionment of future response costs. *See*, page 1401 *supra.* The parties have not reached a complete or partial settlement, and the Court interprets their "Joint Report" to be an election to proceed with a trial on liability followed by an apportionment hearing. The Special Master is therefore directed to confer with the parties and, thereafter to prepare and submit to the Court a Recommendation not later than March 4, 1988 outlining suggested pre-trial and pre-hearing schedules.

Finally, the "Stipulation and Agreement" regarding long-term funding, filed by the United States and Original Generator Defendants on December 14, 1987, is accepted and approved.

IT IS SO ORDERED.